**No. 20-7020**

In the
**United States Court of Appeals**
for the
**District of Columbia Circuit**
———————————————

CHRISTOPHER CHANDLER
*Plaintiff-Appellant*
v.

DONALD BERLIN, *et al.*
*Defendants-Appellees*

———————————————

On Appeal from the United States District Court
For the District of Columbia
Case No. 1:18-cv-02136-APM

———————————————

**BRIEF FOR APPELLEES**
———————————————

John P. Dean
Steven M. Oster
**OSTER McBRIDE PLLC**
1320 19th Street, N.W.
Suite 601
Washington, D.C. 20036
(202) 596-5291
soster@ostermcbride.com
johndean8@aol.com

*Attorneys for Appellees*

July 29, 2020

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

Appellees Donald Berlin, Investigative Consultants Inc., and Investigative Consultants of Washington, DC, Inc. (the "ICI Companies") make the following disclosures pursuant to Circuit Rule 28(a):

**Parties:** All parties to this appeal are listed in the brief for Appellant Christopher Chandler. The ICI Companies do not have any parent company and no publicly held company has any ownership interest in them.

An additional party — Investigative Consultants Incorporated — with offices in Richmond, Virginia, was a defendant in the District Court. That company has no connection to Berlin or the ICI Companies and was voluntarily dismissed. Public Appendix ("A") 13.

**Rulings Under Review:** References to the rulings of the District Court that are under review are contained in the Brief for Appellant. In addition to those rulings, the Notice of Appeal sought review of the District Court's October 16, 2018, Order granting in large part Defendants' motion to strike portions of the complaint pursuant to Fed. R. Civ. P. 12(f), A9-12, reported at 2018 US Dist. LEXIS 228725. By not challenging that ruling in his opening brief, Chandler has waived any appeal of it.

**Related Cases:** This case has not previously been before this Court. Counsel are unaware of any related cases, but we note that Defendants' motion for sanctions,

filed February 13, 2020, is pending in the District Court. The pendency of that motion does not affect the finality of the District Court's judgment for purposes of appeal. *See, e.g., Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 396 (1990) (sanctions motion presents a collateral issue).

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ............. i

TABLE OF AUTHORITIES ........................................................ .... vi

GLOSSARY .................................................................................. xi

STATEMENT OF JURISDICTION ................................................... 1

STATEMENT REGARDING ORAL ARGUMENT ............................... 1

STATEMENT OF THE ISSUES ......................................................... 2

STATUTES AND REGULATIONS .................................................... 3

STATEMENT OF THE CASE ............................................................ 3

    I.   Introduction ........................................................................... 3

    II.  Statement of Facts ................................................................. 4

        A.  The Limited Report and Its Preparation in 2003 ............................. 4

        B.  Robert Eringer ...................................................................... 6

        C.  Eringer's Public Accusations and Chandler's Knowledge of Them. ........... 9

        D.  Republication of the Limited Report in 2017 ............................... 11

        E.  The Blackmail Letter ............................................................ 12

    III.  Proceedings in the District Court ............................................... 15

        A.  The Rule 12(f) Motion .......................................................... 15

        B.  The First Summary Judgment Motion ....................................... 16

        C.  The Second Summary Judgment Motion ..................................... 19

SUMMARY OF ARGUMENT ......................................................... 21

STANDARD OF REVIEW ............................................................. 22

ARGUMENT ..........................................................................................................23

I. THE DISTRICT COURT CORRECTLY DISMISSED ALL CLAIMS BASED ON THE 2017 REPUBLICATION OF THE LIMITED REPORT BECAUSE BERLIN DID NOT REASONABLY FORESEE THAT REPUBLICATION. ...... ..........................................................................................................................23

    A.  The District Court Relied On A Combination Of Relevant, Undisputed Facts to Conclude That Eringer's Republication Was Not Reasonably Foreseeable To Berlin. ...................................................................................23

    B.  The District Court Correctly Evaluated The Foreseeability Of The Republication That Actually Occurred. ..........................................................25

    C.  Eringer's Republication After Fourteen Years Was Not Reasonably Foreseeable, Especially Because Republication Could Not Accomplish The Supposed Purpose Of The Limited Report. ........................................................26

    D.  Eringer's Charges Were Newsworthy In 2017 Because Of The Brexit Debate, Not the "Discreditable" Nature Of Those Charges. ............................29

    E.  Eringer Was Not A Reporter When Berlin Gave Him The Limited Report... ..........................................................................................................................31

    F.  The District Court Properly Considered The Limited Distribution Of The Report And Its "Confidential" Designation. ......................................................33

    G.  Summary. ................................................................................................34

II.  THE DISTRICT COURT CORRECTLY HELD THAT THE STATUTE OF LIMITATIONS BARS ANY CLAIM BASED ON THE 2003 PUBLICATION OF THE LIMITED REPORT TO ERINGER. ......................................................35

    A.  The Statute of Limitations And The Discovery Rule. ................................35

    B.  Chandler Knew Enough To Sue Eringer By November 2015. ....................37

    C.  Chandler Also Knew Enough To Investigate The Author Of The Documents That Eringer Said He Possessed. ...................................................38

    D.  In the Alternative, the Fitzgerald Rule Applies. ........................................42

    E.  Berlin and Eringer Were "Closely Connected." ........................................44

iv

F.  In November 2015, The Alleged Damage to Chandler's Reputation From Eringer's Work and the Limited Report Was The "Same Harm." .....................46

G.  The District Court Correctly Held That a Reasonable Investigation by Chandler Would Have Revealed The Limited Report. ....................................49

H. Summary ..................................................................................................53

CONCLUSION ..............................................................................................54

CERTIFICATE OF COMPLIANCE ..................................................................55

CERTIFICATE OF SERVICE ..........................................................................56

# TABLE OF AUTHORITIES

**Cases**

*Baskin v. Hawley,*
807 F.2d 1120 (2d Cir. 1986) ........................................................................ 50, 51

*Beckwith v. Interstate Mgmt.*
*Co.,* 82 F. Supp. 3d 255 (D.D.C. 2015) ...............................................................34

*Bement v. N.Y.P. Holdings, Inc.,*
307 A.D. 2d 86 (1st Dept. 2003) .........................................................................31

*Beroiz v. Wall,*
84 Cal. App.2d 485, 100 Cal. Rptr. 2d 905 (2d Dist. 2000)................................34

*Board of Regents v. Tomanio,*
446 U.S. 478 (1980)............................................................................................35

*Bochetto v. Gibson,*
860 A.2d 67 (Pa. 2004)........................................................................................52

*Brin v. S.E.W. Investors,*
702 A.2d 784, (D.C. 2006) ..................................................................................49

*Bruno v. Western Union Fin. Servs.,*
A.2d 713 (D.C. 2009) ..........................................................................................34

*Bryan v. News Corporation*, 2018 WL 720057 (Cal. Ct. App.
2/6/18)……………………………………………………………………….30

*Cevenini v. Archbishop of Washington,*
707 A.2d 768 (D.C. 1998) ...................................................................................42

*Colbert v. Georgetown Univ. Hosp.,*
641 A.2d 469 (D.C. 1994) ...................................................................................48

\* Authorities on which we principally rely are marked with an asterisk.

*Cooter & Gell v. Hartmarx Corp.,*
496 U.S. 384 (1990)......................................................................................... ii, 1

*Davis v. Costa-Garvas,*
580 F. Supp. 1082 (S.D.N.Y. 1984) ....................................................................31

*\*Diamond v. Davis,*
680 A.2d 364 (D.C. 1996) ................. 20, 35, 36, 37, 38, 39, 40, 42, 73, 47, 49, 50

*Eringer v. Principality of Monaco,*
533 Fed. Appx. 703 (9th Cir. 2013).....................................................................7

*\*Estate of Chappelle v. Sanders,*
442 A.2d 157 (D.C. 1982) ........................................ 38, 39, 40, 42, 43, 44, 49, 51

*\*Fitzgerald v. Seamans,*
553 F.2d 220 (D.C. Cir. 1977)...................... 20, 42, 43, 44, 45, 46, 47, 48, 49, 51

*Foltz v. U.S. News and World Report,*
627 F. Supp. 1143 (D.D.C. 1986).......................................................................51

*Founding Church of Scientology of Washington, D.C. v. American Medical Ass'n*,
377 N.E.2d 158, 161 (Ill. App. Ct. 1978)………………………………..…..30

*Fridman v. Orbis Business Intelligence Ltd.,*
2020 DC App. LEXIS 220 (D.C. 6/18/20) ..........................................................21

*Gardel v. SK&A Structural Eng'rs PLLC.,*
286 F.Supp.3d 120 (D.D.C. 2017)......................................................................46

*Geraci v. Probst*, 15 N.Y.3d 336 (N.Y. 2010)………………………………….30

*\*Green v. Cosby,*
138 F. Supp.3d 114 (D. Mass. 2015)............................................................ 27, 28

*Hendel v. World Plan Council,*
705 A.2d 656 (D.C. 1997) .................................................................................35

*HV Assocs. LLC v. PNC Bank, N.A.*, No 17-8128 (SRC), 2018 WL 1731346 (D. N.J. 4/10/18)……………………..…………………………………………..……30

*Ingber v. Ross,*
   479 A.2d 1256 (D.C. 1984) .................................................................. 21, 24

*Jankovic v. International Crisis Group,*
   494 F.3d 1080 (D.C. Cir. 2007)..................................................................42

*Liberty Lobby, Inc., v. Anderson,*
   746 F.2d 1563 (D.C. Cir. 1984), *vacated on other grounds,* 477 U.S. 242 (1986)..
   ...................................................................................................................8

*Locke v. Allstate Ins. Co.,*
   1998 U.S. App. LEXIS 7816 (10th Cir. 4/22/98)........................................ 50, 51

*Marcin v. Reliance Standard Life Ins. Co.,*
   861 F.3d 254 (D.C. Cir. 2017)....................................................................22

*Moore v. Allied Chemical Corp.,*
   480 F. Supp. 364 (E.D. Va. 1979) ...........................................................30

*MSK EyEs Ltd. V. Wells Fargo Bank,*
   546 F.3d 533 (8th Cir. 2008) .....................................................................34

*Murphy v. Boston Herald, Inc.,*
   865 N.E.2d 746 (Mass. 2007) ...................................................................30

*Nelson v. American Nat'l Red Cross,*
   26 F.3d 193 (D.C. Cir. 1994)......................................................................48

*Nieves-Romero v. United States,*
   715 F.3d 375 (1st Cir. 2013).......................................................................18

*Oparaugo v. Watts,*
   884 A.2d 63 (D.C. 2005) ............................................................................24

*Tavoulareas v. Piro,*
   759 F.2d 90 (D.C. Cir. 1985), *vacated on other grounds,* 763 F.2d 1472 (D.C.
   Cir. 1985) ............................................................................................ 25, 31

*Tennenbaum v. Ariz. City Sanitary Dist.*,
2013 U.S. Dist. LEXIS 77534 (D. Ariz. June 3, 2013) .........................................33

*Tumbarella v. Kroger Co.*,
271 N.W.2d 284 (Mich. Ct. App. 1978).............................................................30

*United States v. Kubrick,*
444 U.S. 111 (1979).......................................................................................35

*United States v. Rice,*
727 Fed. Appx. 697 (D.C. Cir. 2018) ................................................................51

*Unsworth v. Musk*,
2019 U.S. Dist. LEXIS 229076 (C.D. Cal. Nov. 18, 2019) ...................................33

*Wiggens v. Creary*,
475 So.2d 780 (La. Ct. App.), *writ den'd*, 478 So.2d 910 (La. 1985)..................31

*Workman v. United Methodist Comm.,*
320 F.3d 259 (D.C. Cir. 2003)........................................................................34

*Wright v. Bachmurski*,
29 P.3d 979 (Kan. Ct. App. 2001) ...................................................................31

*Yarus v. Walgreen Co.*,
2015 U.S. Dist. LEXIS 28212 (E.D. Pa. March 6, 2015)....................................34

**Statutes**

28 U.S.C. §1291 ...........................................................................................1

28 U.S.C. §1332(a)(2) ...................................................................................1

28 U.S.C. §1605(a)(2)....................................................................................8

*D.C. Code §12-301(4)..............................................................................4, 23

D.C. Code §22-3252(a)..................................................................................15

## Rules

Cir. R. 28(a) ........................................................................................ i

LCVR 7(h)(1) ....................................................................................19

Fed. R. App. P. 32(a)(5) ...................................................................55

Fed. R. App. P. 32(a)(6) ...................................................................55

Fed. R. App. P. 32(a)(7)(B) ..............................................................55

Fed. R. Civ. P. 12(b)(6) ....................................................................17

Fed. R. App. P. 32(f) .........................................................................55

Fed. R. Civ. P. 12(d) .........................................................................17

Fed. R. Civ. P. 12(f) ..................................................................... i, 15

Fed. R. Civ. P. 56(c) .........................................................................23

Fed. R. Civ. P. 56(d) ................................................................. 18, 23

## Other Authorities

51 Am. Jur. 2d, Limitation of Actions, §148 (1970) .............................39

Restatement (Second) of Torts § 576 ........................................ 24, 25, 30

# GLOSSARY

| Berlin | Defendants-Appellees Donald Berlin, Investigative Consultants, Inc., and Investigative Consultants, Inc. of Washington DC. |
|---|---|
| Chandler | Plaintiff-Appellant Christopher Chandler |
| A___ | Citation to Public Appendix |
| Supp. App.___ | Citation to Supplemental Appendix |
| Br. | Appellant's Brief |
| District Court Docket | Citation to District Court Docket Number |
| ICI Companies | Appellees Investigative Consultants, Inc., and Investigative Consultants, Inc. of Washington DC |

## STATEMENT OF JURISDICTION

The District Court had diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(2). Plaintiff Chandler is a citizen of New Zealand and Malta who resides in Dubai. Defendant Berlin is a citizen of Virginia. Co-Defendants ICI Companies are Illinois and Wisconsin corporations having their principal places of business in the District of Columbia. Chandler seeks $15 million in damages.

This Court has appellate jurisdiction pursuant to 28 U.S.C. §1291. The District Court entered final judgment on January 30, 2020, A497, and Chandler filed a timely notice of appeal on February 27, 2020. A498. Berlin's post-judgment motion for sanctions remains pending but does not affect this appeal. *See, e.g., Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 396 (1990) (sanctions motion presents a collateral issue).

## STATEMENT REGARDING ORAL ARGUMENT

Berlin respectfully requests oral argument. The Court's consideration of the issues presented on this appeal may be advanced or assisted by the presence of counsel to comment and respond to inquiries from the Court. This case involves the interpretation and scope of important District of Columbia laws regarding application of the discovery rule to the statute of limitations for defamation claims that merit the opportunity for oral advocacy.

**STATEMENT OF THE ISSUES**

1.     Did the District Court correctly conclude that Robert Eringer's alleged 2017 republication of Berlin's Limited Report was not reasonably foreseeable when Berlin sent that report to Eringer in Monaco in 2003 in light of the following factors, among others:

   a) The republication occurred over 14 years after Berlin gave the Limited Report to Eringer;

   b) Republication could not have accomplished the alleged purpose of the Report;

   c) The report was about Chandler and his brother, citizens of New Zealand then residing in Monaco, and their activities in Monaco, Russia, Switzerland, and elsewhere, but does not describe anything occurring in Great Britain;

   d) The Limited Report, prepared for an intelligence agent, is expressly labeled confidential;

   e) Accusations of Russian influence upon Chandler became newsworthy in Great Britain in 2017 because he had founded and funded a British think tank whose members included prominent advisors to senior British officials concerning Brexit. The founding of the think tank and the Brexit controversy occurred years after the Limited Report.

2. Did the District Court correctly conclude that the one-year statute of limitations in D.C. Code §12-301(4) bars Chandler's claim arising out of Berlin's 2003 delivery of the Limited Report to Eringer because Chandler, who knew for years that Eringer claimed to have documents supporting his allegations, took no action to learn what was in those documents, preferring to "leave the curiosity to others"?

## STATUTES AND REGULATIONS

The only relevant statute, D.C. Code. §12-301(4), is set forth in Appellant's Brief ("Br.") at 4.

## STATEMENT OF THE CASE

### I.     Introduction

Appellant Christopher Chandler may be correct that this case "presents two straightforward questions of law," Br. at 1, but the legal issues in this appeal are subsumed in one overarching question: Must the appellees, Donald Berlin and the small business he owns, be forced to undertake the heavy burden and considerable expense of defending the accuracy of a report more than 15 years old when this case was filed?

The so-called "backdrop" of allegations about Chandler, Br. at 1, is just that — background. Whether those accusations are true or false has no bearing on the issues before this Court. If necessary, Berlin will defend his work, which was limited

to reporting on available information from various open source data bases and was given to Eringer with the understanding that it should not be relied upon unless verified. But Berlin should not have to defend himself at this late date. District of Columbia law holds that neither Berlin nor the District Court should devote resources to answering stale questions about Chandler's activities during the 1990s and early 2000s, which were the subject of Berlin's report.

## II.     Statement of Facts

### A.  The Limited Report and Its Preparation in 2003.

Berlin owns the ICI Companies, through which he has provided global investigative services for many years to a wide variety of clients.[1] In late 2002, Robert Eringer, a former FBI counter-intelligence operative, *see* Supplemental Appendix ("Supp. App.") 20, was an intelligence advisor to Prince Albert of Monaco. The Prince employed Eringer "to assist him in rooting out corruption, money laundering and organized crime in Monaco." A308, ¶6. Consistent with that job, Eringer hired Berlin to prepare a report about the activities of Chandler and his brother, two reclusive billionaires living in Monaco. A64, ¶38.

Berlin delivered his report to Eringer more than 15 years before the filing of this case. The report, dated February 24, 2003, is entitled "Introduction and

---

[1] Unless the context indicates otherwise, we will refer to Berlin and the ICI Companies collectively as "Berlin" throughout this brief.

Overview[:] Richard Chandler Limited Global Scan," (the "Limited Report"). A83-116. Although the title of the report refers only to Richard Chandler, the Limited Report discusses activities of both brothers.[2]

Plaintiff's complaint admits that Berlin sent the Limited Report "privately" to Eringer in 2003 (A71, ¶62; A76, ¶76) and that no else one had a copy before November 2017 (A59, ¶11; A71, ¶62). The Limited Report contains the heading "CONFIDENTIAL MEMORANDUM TO FILE" on every page except the first. A84-A116. The heading also states that the report contains 134 pages. *Id.* The version attached to the complaint has only 34 pages, however, and there is no apparent explanation for the missing pages.[3]

Berlin has consistently maintained that his report was a limited one, hence the term "Limited" featured prominently in its title and heading. He asserts that the report is a compilation of information from open source databases, requiring independent verification before it could be relied upon and that Eringer understood this. A427-428, ¶¶1-4. Chandler has a different view. His theory of the case is that Eringer and Berlin colluded to create a false narrative to defraud Prince Albert into paying them for further costly investigations of the Chandler brothers. A57, ¶¶3-4.

---

[2] Only Christopher Chandler sued Berlin.

[3] Berlin no longer has a copy of the Limited Report and is unable to supply any missing pages.

Resolution of these divergent views is not at issue in this appeal. It is appropriate to note, however, that the complaint's theory is inconsistent with arguments that Chandler advanced on summary judgment and repeats in this Court. *See* pp. 8-9; 32-34, *infra* (publication of the Limited Report would defeat the supposed scheme to get money from Prince Albert, who would not pay for publicly reported information); pp. 29; 45-47, *infra* (complaint's allegation that Berlin and Eringer worked together contradicts Chandler's denial of a "close connection" between the two).

**B. Robert Eringer**

Robert Eringer plays a major role in this case, even though Chandler never sued him. Twenty-one months after receiving the Limited Report from Berlin, Eringer wrote a separate report about the Chandlers. A133-150. His report says he took several steps on his own to investigate them, including having an assistant confer with Swiss authorities, A147-48, recruiting a source within the Chandlers' Monaco headquarters, A148-50, and surveilling their building. A136-37. His report accuses the Chandlers of a wide variety of improper conduct on behalf of Russian and others' interests.

Chandler tries to create a false impression of Eringer's activities. He belittles Eringer's intelligence work for Prince Albert, *see, e.g.,* Br. at 8-9 ("Eringer christened himself 'Agent 001' ") while arguing that Eringer really was a reporter.

However, the undisputed evidence, primarily supplied by Chandler himself, establishes that Eringer was a *bona fide* intelligence operative for the Prince for many years, including when Berlin prepared the Limited Report.

Among Chandler's exhibits on summary judgment is a copy of a verified complaint filed by Eringer against Prince Albert in a California court after the Prince terminated his services. A305-340. Because the complaint is verified it is, as Chandler recognized, "effectively . . . a sworn statement." A448. That sworn statement includes a detailed recounting of all the intelligence work Eringer did for the Prince from June 2002 through March 2008, for which he was paid more than €1.7 million. A308, ¶ 6; A335, ¶145. In addition to his investigations of the Chandlers, the verified complaint describes at least 30 other intelligence investigations that Eringer conducted for Prince Albert. A309-33.

Eringer's lawsuit claimed the Prince stopped paying him. A336, ¶147. Although the litigation was unsuccessful, the dismissal of his case does not disprove the statements in Chandler's exhibits establishing that Eringer was in fact an intelligence agent for Prince Albert.[4]

---

[4] Eringer voluntarily dismissed his suit against Prince Albert personally. District Court Docket 22-11. He then sued the Principality of Monaco. The Ninth Circuit ruled against him on sovereign immunity grounds, holding that Eringer's intelligence services were not "commercial activities" under the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a)(2), because those services were not activities

Eringer also wrote a book in 2014, *The Spymaster of Monte Carlo*, and Chandler included the entire book as one of his summary judgment exhibits. District Court Docket 22-12.[5] That exhibit describes in much greater detail Eringer's intelligence work for Prince Albert between 2002 and 2008. Some of Chandler's other exhibits also describe Eringer as an intelligence advisor for the Prince. *E.g.,* A157-58; A224. It is undisputed, therefore, that Eringer performed intelligence work for Prince Albert between 2002 and 2008.

Yet Chandler's brief tries to recast Eringer's principal occupation as a reporter. Br. at 7-8. However, the evidence, again supplied by Chandler himself, shows at most that any "reporting" work occurred years before his intelligence work in Monaco.

The sources for Chandler's claim are sparse. Two of them describe events in the early 1980s, more than 20 years before the Limited Report. Br. at 7-8. One is a 1980 book; the other is this Court's decision in *Liberty Lobby, Inc., v. Anderson,* 746 F.2d 1563, 1567 (D.C. Cir. 1984), *vacated on other grounds,* 477 U.S. 242 (1986), which describes Eringer as a journalist who was a source for an article written in 1981. 746 F.2d at 1567. Chandler also cites a *Salon* magazine article alleging that

that "private parties can undertake." *Eringer v. Principality of Monaco,* 533 Fed. Appx. 703, 705 (9th Cir. 2013).

[5] The Supplemental Appendix contains excerpts from Eringer's book.

Ringling Brothers Circus head Kenneth Feld hired Eringer and former CIA Chief of Covert Operations Clair George not as reporters but to perpetrate a years-long ruse to **prevent** publication of a book critical of Feld and the Circus. A406-13. The *Salon* article describes Eringer as one of a "group of spies" hired by Feld. A410.[6]

Chandler cannot escape the undisputed facts established by his own exhibits. Whatever Eringer was doing in the 1980s and early 1990s, he indisputably was an intelligence agent for the Prince for five and a half years, including when he hired Berlin to prepare the Limited Report.

**C. Eringer's Public Accusations and Chandler's Knowledge of Them.**

As noted above, in 2009, Eringer filed a verified complaint against Prince Albert. The complaint states that Eringer investigated the Chandlers, that they were doing "unregistered, unlawful business" in Monaco and that they were suspected of "money laundering for Russian interests." A310-A311, ¶¶13, 23. Eringer explicitly stated that he "possesses documents on this matter." A310, ¶13.

It was not long before the Chandlers became aware of Eringer's charges. On January 11, 2010, Jonathan McDonnell, who is not otherwise identified, sent Chandler an email attaching Eringer's verified complaint. That same day, Chandler forwarded the email to his brother with the following comments:

---

[6] The article also says that Eringer wrote "a few magazine articles," (citing only one article written in the 80s) and "a handful of spy novels." A408.

> [T]he attachment to his email reads like a trashy dime novel. We feature in items 13 and 23 as nefarious-sounding individuals ". . . doing unregistered, unlawful business in Monaco . . ." .
>
> Pity to see this type of unfounded assertion/allegation in a court filing, effectively as a sworn statement. Not good for our reputation, even though we know it to be false. **Makes me wonder if we should sue this guy (Robert Eringer) to force him to prove the comment or retract it.** Clearly this court document is being publicly circulated if Jonathan McDonnell has a copy.

A448 (Emphasis added).

Confronted with this email, Chandler admitted that he was aware of Eringer's complaint and its references to him no later than January 11, 2010. A442 (Response 27). Although he thought about suing Eringer, he never has done so.

The verified complaint was not Eringer's only public accusation against the Chandlers. His 2014 book, *The Spymaster of Monte Carlo,* also contains accusations that Chandler was involved in money laundering and other improper connections with Russian interests. Supp. App. at 3-15. In addition, no later than 2015, Eringer published a website entitled *The Art of the Ruse: Richard and Christopher Chandler* that contains excerpts from his book discussing his charges against the Chandlers. A251-58.

Chandler admitted that he was aware of both the book and the website no later than November 2015. A443 (Responses 28 and 29). On November 6, 2015, he received an email calling his attention to Eringer's *Art of the Ruse* website, calling

it an "evil article written by Robert Eringer" that was "evil and damaging to you."

A450. Chandler responded:

> **This is old news and has been around for years**. Thanks for pointing it out. A wonderful fiction and I guess that is how some people make their living! Shame on the people involved.

A450 (Emphasis added).

Another email corroborates Chandler's statement that Eringer's allegations were "old news [that] has been around for years." On July 29, 2012, he received an email about damaging information in the "Eringer blog." Its author said that he "can't imagine you wish to undertake any action in response." Chandler agreed: "As you suggest, we can carry on with our lives and leave the curiosity to others." A452.

### D. Republication of the Limited Report in 2017

In December 2017, the *Sunday Times* of London reported on an "87 page dossier" that was "being circulated about Chandler and his brother Richard with allegations over links to Russia." A156. Although Chandler's brief on appeal uses the term "Dossier" to describe Berlin's Limited Report, the 87-page dossier mentioned in the *Times* report obviously consisted of more than just the 34 pages of the Limited Report that form the basis of Chandler's claims.[7]

---

[7] The complaint uses the term "Fake Dossier" to refer to the Limited Report and the separate 18-page report compiled by Eringer 21 months after he received Berlin's report. A59, ¶12. But those two documents taken together comprise 52 pages, so additional documents must be part of the 87-page dossier referred to by the *Times*.

In May 2018, a Member of Parliament announced that he had seen various documents, including police files from Monaco and French intelligence reports, alleging improper connections between Russian interests and Chandler. He expressed concerns about Russian influence upon Chandler because Chandler was the founder and major funding source for the Legatum Institute, a London-based think tank founded in 2007.[8] Those allegations were widely reported in the British press. A159-246. According to press reports, some officials of the Legatum Institute had been meeting with Boris Johnson and other officials to advocate in favor of a "hard Brexit," contrary to the plans of then-Prime Minister Teresa May. *See, e.g.,* A156, 193-95,197-98, 237-39.

The complaint alleges that Eringer gave the Limited Report and other documents about Chandler to the British press in November 2017, A59 ¶12, A69, ¶57, and that the remarks in Parliament about Chandler were based on the Limited Report and Eringer's separate report. A71-72, ¶62.

### E. The Blackmail Letter

Although previously content to "leave the curiosity to others," Chandler undertook a different strategy after Eringer's 2017 publication of his charges. He

---

[8] Press reports give various dates for the Legatum Institute's founding. The Institute's website asserts that it was founded in 2007. (https://li.com/about/our-story) (last visited 7/26/2020).

took no action against Eringer, but embarked on a plan to coerce an exculpatory statement from Berlin. Chandler's attorneys addressed a letter to Berlin dated September 11, 2018. That was Berlin's first notice of any dispute with Chandler. The letter gave Berlin "one opportunity" to avoid litigation: Chandler's attorneys demanded that, within 48 hours, Berlin: (1) sign a statement averring that he knew that the Limited Report was entirely false; (2) agree to be interviewed by Chandler's attorneys; (3) provide an unspecified affidavit; and (4) agree that he would never respond to any inquiries about Chandler or Eringer without instructions from Chandler's attorneys. A16-20.

If Berlin failed to meet their demands within 48 hours (later extended by an additional 24 hours), Chandler's attorneys threatened suit, and enclosed a copy of their draft complaint. A21-48.[9] That complaint contained numerous misleading, irrelevant, and scandalous allegations about Berlin and his wife, who is not a party to this case and had nothing to do with the creation of the Limited Report. The draft complaint contained false and misleading accusations of criminal conduct supposedly occurring years before or after preparation of the Limited Report and even incorporated postings from Mrs. Berlin's Facebook page to falsely suggest that she was embarrassed by Berlin's work for the ICI Companies. Those untrue

---

[9] The cited portion of the Appendix is redacted due to the District Court's order on Berlin's motion to strike, discussed below. The redacted portions may be viewed in the separate Sealed Appendix.

allegations had nothing to do with any element of a claim for defamation, and the District Court later found them "beneath the dignity of this court." A10.

The letter left no doubt about the reason for including those misleading, immaterial, and scandalous allegations in the complaint. Chandler's attorneys said that if Berlin did not agree to their demands within their unreasonable deadline, they would "leverage [their] contacts in the media" to ruin his business by informing previous and prospective clients about their claims. A17-A18. That threat violated the District of Columbia's blackmail statute, which prohibits any threat "to publicize an asserted fact, whether true or false" that tends to "impair the reputation of any person" if the threat is communicated "with intent to obtain property of another or to cause another to do or refrain from doing any act." D.C. Code §22-3252(a).

Berlin did not give in to the threats. His counsel explained that Berlin was unwilling to sign a statement that falsely said that he knew Chandler was innocent. Berlin offered to provide a statement explaining that his report was limited to information available at the time in various databases and was given to Eringer with the understanding that it could not be relied upon without verification. A50-54. That was unacceptable to Chandler, who filed this case on September 14, 2018, three days after his attorneys' first contact with Berlin.

The filed complaint was essentially identical to the draft complaint that accompanied the September 11th letter. It alleged two causes of action for

defamation, one for statements in the 34-page portion of the Limited Report attached to the complaint, A71-76, and the other based on speculation about what was contained in the other pages. A76-81.

## III.  Proceedings in the District Court

### A. The Rule 12(f) Motion

Soon after Chandler filed his complaint, Berlin filed a motion pursuant to Fed. R. Civ. P. 12(f), which permits a court to strike "immaterial, impertinent, or scandalous matter." That motion argued that the complaint contained numerous allegations having nothing to do with a properly pleaded defamation claim. Berlin asked the District Court to strike those allegations, to seal the complaint, and to require Chandler to file an amended complaint.

The District Court granted that motion in large part. It characterized the complaint as "nasty and snide," and intended to "embarrass and humiliate" Berlin. A10. The allegations challenged by Berlin were "beneath the dignity of this court," with "absolutely no relevance to the events in question," and were intended to "cast Berlin in a sinister and pernicious light" with "no substantiation." A10. Other allegations were an unwarranted attempt "to create a caricature of Berlin as devious and deceitful." A10. The Court noted that Chandler's efforts to "embarrass and humiliate . . . Berlin included "gratuitously tak[ing] a swipe at Berlin's spouse" using "innuendo [that] has no place in Plaintiff's complaint." A11.

The Court struck those allegations, sealed the complaint and the motion papers, and ordered the parties to file redacted copies of those documents without any mention of the offending materials.[10] A11-12.The operative complaint in this matter is the redacted complaint filed on October 22, 2018. A55-82.

**B. The First Summary Judgment Motion**

Berlin filed a motion to dismiss or, in the alternative, for summary judgment on October 25, 2018. That motion argued that the complaint described two different "publications" of Berlin's Limited Report — the delivery of the report to Eringer in 2003 and Eringer's alleged delivery of the report to the British press ("republication") more than 14 years later. The complaint did not say, however, which of those two publications caused the injury for which Chandler was seeking damages.

The motion argued that the complaint failed to state a claim upon which relief could be granted, regardless of the publication for which Chandler sought relief. Because the complaint failed to allege that Berlin reasonably could have foreseen Eringer's 2017 republication, it failed to allege a necessary element of liability. Furthermore, because the District of Columbia Court of Appeals has never held that

---

[10] Because Chandler's offensive allegations are sealed, we have not described them in detail in this public filing. The original unredacted complaint is in the Sealed Appendix.

a discovery rule applies to defamation claims, the motion argued that the one-year statute of limitations for any claim about the 2003 publication had run.

Alternatively, the motion argued that summary judgment was appropriate. As to the 2017 republication, Berlin submitted a declaration that he did not "give permission, authorize, know or foresee" that Eringer or anyone else would give his Limited Report to anyone, including the British press or Members of Parliament. A.264, ¶7. Indeed, to prevent any subsequent use of the Report, he marked it "Confidential Memorandum to File." A264, ¶5 As to the 2003 publication of the Report to Eringer, the motion argued that Eringer's prior publications of his claims about the Chandlers, including his statement that he had documents to support his charges, were sufficient to put Chandler on inquiry notice of the Limited Report, thereby starting the running of the statute of limitations years before he filed this suit.

The District Court granted the motion in part. Because the parties had referred to matters outside the pleadings, it did not rule on the Rule 12(b)(6) motion but addressed the alternative summary judgment motion pursuant to Fed. R. Civ. P. 12(d). As to the 2017 republication, the Court relied upon District of Columbia law requiring that the original publisher of a defamatory statement may be liable for the republication of that statement only if the republication was reasonably foreseeable. A421.

The Court held that no reasonable jury could conclude that Eringer's alleged republication was foreseeable to Berlin in 2003, relying upon Berlin's declaration, the 14-year interval between the original publication and the republication, the limited distribution of the report in 2003 (given only to Eringer), the marking of the report as "Confidential," and the onset of the debate about Brexit, which could not have been anticipated in 2003. A422-24. The Court noted Chandler's reliance on evidence that Eringer had been a writer years before hiring Berlin to prepare the Limited Report, but that was insufficient to create a factual dispute about whether it was reasonable to expect Eringer to disclose the report. A421-22. The Court also noted that Chandler did not seek to take any discovery, and in particular did not seek to depose Berlin, before opposing summary judgment, notwithstanding Fed. R. Civ. P. 56(d), which gave him the right to do so. A421, n.3.[11]

The District Court denied the portion of the motion seeking dismissal of claims based on Berlin's 2003 publication of the Limited Report to Eringer on statute of limitations grounds. The Court held that the discovery rule would apply to defamation claims. A424, n5. It considered Berlin's argument that Chandler knew

---

[11] Chandler's failure to depose Berlin or invoke Rule 56(d) has consequences – Chandler cannot now fault the District Court for not considering what Berlin may or may not have known outside of the record. *See Nieves-Romero v. United States*, 715 F.3d 375, 382 (1st Cir. 2013) (where plaintiff "did not make the slightest effort either to comply with the requirements of Rule 56(d) or to conduct discovery diligently, the district court did not abuse its discretion in ruling on the fully briefed summary judgment motion….").

or should have known about Eringer's prior publications and that a defamation lawsuit against Eringer would have led to discovery of the Limited Report several years ago.

The Court acknowledged that "Defendants' argument has some appeal," but held there was "no evidentiary support on the present record" for its "predicate assumption" that Chandler knew or should have known about Eringer's prior publications. A425. Berlin's statement of undisputed facts filed pursuant to the LCvR 7(h)(1) asserted that Chandler knew about those publications but Chandler's response was a denial, claiming there was "controverting evidence." A278-79. Citing that response, the District Court concluded that there was a material factual dispute and denied summary judgement. A425.

The Court recognized that full merits discovery was likely to be "time consuming and expensive." *Id.* To avoid those costs, the Court ordered an initial period of limited discovery directed solely at the statute of limitations. A425-426.

### C. The Second Summary Judgment Motion

The limited discovery ordered by the District Court revealed that, contrary to Chandler's response to the Rule 7(h)(1) statement, there was no dispute that Chandler was aware of Eringer's charges soon after they were published and there was no "controverting evidence." Chandler produced the emails discussed on pages 9-11 above during the discovery period. In light of those documents, Chandler

conceded that he was aware of Eringer's 2009 verified complaint by early 2010, and Eringer's 2014 book and his website by late 2015. A442-44. Based on these admissions, Berlin renewed his summary judgment motion,

The District Court granted the renewed motion, holding that Chandler's knowledge of Eringer's accusations gave him inquiry notice of any claims based on the Limited Report. As a result, the discovery rule did not toll the statute of limitations after November 2015 at the latest because Chandler knew of Eringer's accusations by then. A481-94.

The Court concluded that Berlin and Eringer were "closely connected" within the rule of *Diamond v. Davis,* 680 A.2d 364, 380 (D.C. 1996), (interpreting *Fitzgerald v. Seamans,* 553 F.2d 220 (D.C. Cir. 1977)), which set forth the circumstances in which knowledge of a claim against one defendant could cause accrual of a claim against another defendant whose existence might not be known to the plaintiff. A486-91. The Court also held that a reasonable investigation by Chandler, including discovery in a lawsuit against Eringer, would have revealed Berlin's preparation of the Limited Report. A491-94. Finally, although the Court ruled that Eringer's 2017 republication of the Limited Report created a different harm than Berlin's initial publication to Eringer, it found no excuse for Chandler's failure to investigate in 2015 after he had learned about Eringer's 2009, 2014 and 2015 publications. A494-96.

## SUMMARY OF ARGUMENT

Under District of Columbia law, one element of a defamation cause of action is "publication," *i.e.,* "the defendant published [a defamatory] statement . . . to a third party." *Fridman v. Orbis Business Intelligence Ltd.,* 2020 DC App. LEXIS 220 at *15 (D.C. 6/18/20). The District Court correctly held that the undisputed facts establish that no valid defamation claim can be based on Eringer's alleged publication of the Limited Report in 2017 or Berlin's original publication of the report to Eringer in 2003.

The parties agree that Eringer's alleged distribution of the Limited Report to the press in 2017 was a republication of that report, subject to the rule that the author of a statement is liable for a republication only if the republication was "reasonably to be expected." *Ingber v. Ross,* 469 A.2d 1256, 1259 (D.C. 1984). The complaint did not so allege, and the District Court correctly ruled that no reasonable juror could have found, that Berlin in 2003 could have reasonably foreseen Eringer's 2017 republication. The 14 years between the publication and the republication, the unanticipated Brexit controversy (the reason why the press was interested in allegations of Russian influence on Chandler) and the inability of republication in Great Britain in 2017 to accomplish the purpose of the report alleged by Chandler are the major, but not exclusive, factors supporting the District Court's conclusion.

Chandler's argument that in 2003 Eringer was a reporter, not an intelligence advisor, has no support in the record. His claim that a statement's author need only expect any republication and not the republication that actually occurred, is also wrong.

The District Court also correctly held that the one-year statute of limitations in D.C. Code 12-301(4) bars any claim arising out of Berlin's original publication of the Limited Report to Eringer. The discovery rule does not toll the statute beyond November 2015. By that time, Chandler indisputably knew about Eringer's accusations, including his assertion that he had supporting documents. That knowledge required Chandler to investigate to discover the documents' author(s), but he did nothing. Because a reasonable investigation in 2015, including a lawsuit against Eringer, would have revealed Berlin's report, the limitations period began to run at that time and Chandler's lawsuit was too late.

**STANDARD OF REVIEW**

This Court reviews "*de novo* the District Court's decision to grant summary judgment. . . . Because this Court analyzes the District Court's judgment, not its reasoning, [it] may affirm on any ground properly raised. . . . To survive a motion for summary judgment, the party with the burden of proof at trial must offer evidence showing that there is a triable issue of fact regarding an essential element of the claim." *Marcin v. Reliance Standard Life Ins.*

*Co.*, 861 F.3d 254, 262 (D.C. Cir. 2017) (citations omitted). In responding to Berlin's Motion, Chandler was not entitled to rest on the allegations of his Complaint. Fed. R. Civ. P. 56(c).

## ARGUMENT

**I. THE DISTRICT COURT CORRECTLY DISMISSED ALL CLAIMS BASED ON THE 2017 REPUBLICATION OF THE LIMITED REPORT BECAUSE BERLIN DID NOT REASONABLY FORESEE THAT REPUBLICATION.**

### A. The District Court Relied On A Combination Of Relevant, Undisputed Facts to Conclude That Eringer's Republication Was Not Reasonably Foreseeable To Berlin.

The District Court ruled that Berlin is not liable for Eringer's 2017 republication of the Limited Report because Berlin did not reasonably foresee that the republication would occur. [12] The Court concluded that settled District of Columbia law and the undisputed facts compelled that conclusion.

The Court relied on Berlin's declaration that he did not give permission, authorize, or know that Eringer would give the Limited Report to anyone, and noted that Chandler "offer[ed] no facts to dispute that contention." A418. In particular, the Court noted that Chandler made no effort to impeach Berlin's testimony by seeking his deposition pursuant to Fed. R. Civ. P. 56(d). A421, n.3. But the Court did not rely exclusively on Berlin's testimony. The undisputed evidence established several

---

[12] That ruling, of course, did not absolve Eringer of liability for the republication, but Chandler once again elected not to sue Eringer.

facts that, considered together, demonstrated why no reasonable juror could find that Berlin reasonably expected the republication that occurred.

The primary factor was the 14-year interval between the transmission of the Limited Report to Eringer and Eringer's alleged republication to the press. In addition, as Plaintiff admitted in the complaint, Berlin gave the Report "privately" to Eringer and no one else. A71, ¶62; A76, ¶76. Such limited distribution showed that it was " 'published under such circumstances or to such persons as to give reasonable assurance that it would go no further.' " A423 (quoting Restatement 2d of Torts sect. 576, comment d). Moreover, marking the report "confidential," was evidence that Berlin "intended for it to remain confidential," thereby expressing on its face "reasonable assurance that it would go no further." A423. Finally, the allegations against Chandler become newsworthy only because of his and his Legatum Institute's involvement in the Brexit debate in Great Britain, a development that Berlin could not have anticipated in 2003. A423-24.

Chandler advances several arguments on this issue, some raised for the first time on appeal, but those arguments are based on erroneous legal standards, misinterpretations of the District Court's rulings, and factual claims having no basis in the record. They provide no grounds for reversing the District Court's well-considered decision.

**B. The District Court Correctly Evaluated The Foreseeability Of The Republication That Actually Occurred.**

Chandler bases his challenge to the District Court's foreseeability ruling on an erroneous premise, arguing that Eringer's 2017 republication was reasonably foreseeable if any republication of the Limited Report to anyone was foreseeable in 2003.[13]

That is not the law. The actual republication that is the source of the plaintiff's claim must be reasonably foreseeable, not some other republication that may or may not have occurred. "The original publisher of a defamatory statement may be liable for [its] republication if **the republication** is reasonably foreseeable." *Oparaugo v. Watts,* 884 A.2d 63, 73 (D.C. 2005) (emphasis added). The Restatement 2d of Torts, sect. 576, quoted in *Ingber v. Ross,* 479 A.2d 1256, 1269 (D.C. 1984), states the same rule. (Original publisher of a libel is liable for harm "resulting from its repetition by a third person if, but only if, . . . (c) **the repetition** was reasonably to be expected") (emphasis added). *See also Tavoulareas v. Piro,* 759 F.2d 90, 136 n.56 (D.C. Cir. 1985), *vacated on other grounds,* 763 F.2d 1472 (D.C. Cir. 1985). (Maker of a defamatory statement "may be held accountable for its republication if **such republication** was reasonably foreseeable") (emphasis added). Thus, the

---

[13] *See, e.g.,* Br. at 31 (arguing that Berlin knew Eringer "would republish . . . to third parties" because of the need to verify statements in the Limited Report); Br. at 18 (District Court should have focused on "whether it was reasonably foreseeable that Eringer would republish it at all.")

District Court properly considered whether Eringer's transmission of the Report to the British press in 2017 was reasonably foreseeable.

### C. Eringer's Republication After Fourteen Years Was Not Reasonably Foreseeable, Especially Because Republication Could Not Accomplish The Supposed Purpose Of The Limited Report.

As noted above, the District Court concluded that the interval of more than 14 years between the creation of the Limited Report and its republication was a major reason for concluding that Berlin did not reasonably foresee that republication. Chandler attacks a straw man when he criticizes the District Court for supposedly ruling that it must be reasonably foreseeable that a "libel would be republished on a specific future date certain." Br. at 33. The District Court did no such thing. As would be expected whenever a court decides an issue of reasonable foreseeability, the District Court looked to all the surrounding circumstances.

The timing of the republication is an important circumstance to consider, as held in the cases relied upon by the District Court.[14]  But neither those cases nor the District Court ruled that it was necessary for a defendant to foresee republication "on a specific future date." Instead, as the District Court said, the cases hold that lengthy

---

[14] *Geraci v. Probst*, 15 N.Y.3d 336, 343 (N.Y. 2010) (republication after three years not reasonably foreseeable); *HV Assocs. LLC v. PNC Bank, N.A.*, No 17-8128 (SRC), 2018 WL 1731346, at *6 (D. N.J. Apr. 10, 2018) (five years); *Founding Church of Scientology of Washington, D.C. v. American Medical Ass'n*, 377 N.E.2d 158, 161 (Ill. App. Ct. 1978) (seven years); *Bryan v. News Corporation*, 2018 WL 720057, at *11-13 (Cal. Ct. App. Feb. 6, 2018) (19 years).

delays between the original publication and the republication "in combination with other factors" compel the conclusion that the republication was not reasonably foreseeable. A422. "Reasonable foreseeability" does not demand an exact date. Rather, it requires consideration of whether a defendant reasonably would have foreseen circumstances similar to those surrounding the republication that occurred.

Chandler relies upon *Green v. Cosby,* 138 F. Supp.3d 114 (D. Mass. 2015), in which the court found republication of a statement was reasonably foreseeable even though nine years elapsed between the original publication and the republication. Br. at 34-35. The defendant issued the statement responding to plaintiff's charges of sexual misconduct and intended to re-issue it if the plaintiff ever repeated those allegations. Nine years later, she did so and the defendant gave the statement to the press. Because the statement was republished for its intended use, the court concluded that the republication was reasonably foreseeable. *Id.* at 127.

*Green* does not inform any issue before this Court. Eringer's republication had nothing to do with the original purpose of the Limited Report as alleged by Chandler. The complaint alleges that the report was prepared to entice Prince Albert to pay for additional investigations of the Chandlers. A57, ¶¶3-4. Republishing the report in 2017 would not accomplish that purpose for at least three reasons: (1) Eringer's relationship with the Prince ended in 2008 after the Prince stopped paying him; (2) the Chandlers no longer lived in Monaco, making it unlikely that the

27

Prince would spend money investigating them; and (3) republication in Great Britain made little sense if the intent was to influence actions in Monaco. Indeed, **any** publication of the Limited Report at any time would conflict with Berlin's and Eringer's supposed goal of getting the Prince to pay for more investigations; the Prince would not pay for information he could obtain from a newspaper.

Although he relies on *Green*, Chandler's brief never discusses why Eringer's 2017 republication was consistent with the supposed purpose of the Limited Report. Instead, he claims that disclosure "to third parties" was consistent with the purpose that **Berlin** identified for the report. Br. at 31. But that argument, newly raised on appeal, does not help him. Even if disclosure of the Limited Report in 2003 might have aided in verifying its statements, that did not make Eringer's 2017 disclosure to the British press any more likely. As discussed above, the relevant inquiry is whether the republication that actually occurred was reasonably foreseeable, not any republication to third parties.[15]

As the District Court held, a lengthy delay between original publication and republication usually shows that the republication was not reasonably foreseeable, absent countervailing factors. There was a unique countervailing factor in *Green,* but nothing remotely similar in this case. Therefore, the passage of over 14 years

---

[15] In addition, if Chandler abandons his complaint's theory on appeal and now agrees with Berlin's stated purpose for the Limited Report, he will not be able to prove the allegations underlying his causes of action.

before Eringer's republication of the Report is powerful, undisputed evidence that Eringer's republication was not reasonably foreseeable.

**D.      Eringer's Charges Were Newsworthy In 2017 Because Of The Brexit Debate, Not the "Discreditable" Nature Of Those Charges.**

Chandler contends that Berlin's understandable failure in 2003 to anticipate the relevance of the Limited Report to the Brexit debate makes no difference. Br. at 37-38. But the basis for that claim is his erroneous argument that the relevant question is whether **any** republication was reasonably foreseeable, not republication "on a specific date." Br. at 37. As discussed above, *see* pp 23-28, that argument is incorrect.

The claim that the actions described in the Limited Report are *per se* newsworthy at any time ignores the circumstances of this case. The alleged 15-year-old Russian connections of a dual citizen of New Zealand and Malta, formerly living in Monaco and now living in Dubai, were of interest to the British press in 2017 only because of his involvement in Brexit. Every British news story mentioning the allegations against Chandler reported about his connection to the Legatum Institute and its officials' support for a "hard" Brexit, usually in the headline and/or the first

paragraph.[16] The Brexit debate was the reason for the press interest in Eringer's allegations and Chandler has cited no contrary evidence.

Chandler's reliance on "the known tendency of human beings to repeat discreditable statements," Br. at 36, quoting Rest. (Second) Torts sect. 576, cmt. d, is insufficient. Defamation cases always involve "discreditable statements." To hold the human propensity to repeat such statements automatically means that repetition of those statements is foreseeable would eliminate the reasonable foreseeability standard. Even discreditable statements lose their immediacy over time. In each of the cases cited in Chandler's brief, the "discreditable statements" all involve either relatively recent events or persons who are currently in the public eye. *See Murphy v. Boston Herald, Inc.*, 865 N.E.2d 746, 754 (Mass. 2007) (plaintiff an allegedly criminal-coddling judge "who has let four accused rapists walk out of court in the past week"); *Tumbarella v. Kroger Co.*, 271 N.W.2d 284, 290 (Mich. Ct. App. 1978) (manager informed other managers that plaintiff had been terminated for theft, apparently soon after the incident); *Moore v. Allied Chemical Corp.*, 480 F. Supp. 264, 376 (E.D. Va. 1979) (applying natural and probable result standard to allegedly defamatory statement made on national telecast of "60 Minutes" concerning poisoning of workers); *Bement v. N.Y.P. Holdings Inc.,* 307 A.D. 2d 86 (1st Dept.

---

[16] *See* A155, A159, A160, A164, A166, A169, A172, A174, A179, A181, A185, A188, A193, A196, A199, A210, A214, A221, A224, A229, A231, A235, A238, A240, A246.

2003), (allegations were newsworthy because a movie script about plaintiff was currently under consideration).

None of those cases holds that republications of unsavory reports are always reasonably foreseeable. In fact, *Davis v. Costa-Garvas,* 580 F. Sup. 1082 (S.D.N.Y. 1984), (cited in Br. at 28) held that the plaintiffs in that case "too broadly construe[d] the notion of foreseeability," because "a defendant with no control or influence over the entity that actually republished the statement" is not liable for the republication. *Id.* at 1096.

**E.     Eringer Was Not A Reporter When Berlin Gave Him The Limited Report.**

Chandler argues extensively that giving a statement to a reporter indicates that republication of that statement is reasonably foreseeable. Br. at 25-28. The cases he cites all deal with individuals interviewed by working reporters for stories. Indeed, some of those individuals issued press releases or otherwise showed that they intended the reporters to republish their statements. *See Tavoulareas*, 759 F.2d at 136 (plaintiff intended reporters to republish statements about former father-in-law in retaliation for "bitter divorce"); *Wright v. Bachmurski*, 29 P.3d 979, 983 (Kan. Ct. App. 2001) (defendants "repeatedly contacted" and sought interviews with local newspaper reporters); *Wiggens v. Creary*, 475 So.2d 780, 782 (La. Ct. App.), *writ den'd*, 478 So.2d 910 (La. 1985) (defendant made allegedly defamatory statements to reporter soliciting comments for a story).

A defendant's liability for republication of statements made to reporters bears no relevance to this case. First, based on Chandler's own evidence, Eringer was not a reporter but an intelligence operative. Second, he was not soliciting comment for a news story from Berlin. Third, Chandler's theory of the case is not that Eringer was a reporter, but that he and Berlin sought to perform additional intelligence investigations for the Prince.[17]

Eringer's reported journalism work, consisting of a "few magazine articles," A408, a reference to him in a 1984 decision of this Court, and his 1980 book, all occurred years before his intelligence work in Monaco. Chandler's claim that Eringer once was a tabloid reporter is unsupported by any evidence saying when, where, or how long. Before working for Prince Albert, Eringer did counter-intelligence work for the FBI, Supp. App. 20, was among a "group of spies" hired to prevent publication of a book about the Circus, A410, and wrote "a handful" of novels. A408. Nothing about that evidence would cause one to reasonably foresee Eringer would disclose confidential intelligence information.

There is no "once a journalist, always a journalist" rule of law. None of the cases cited by Chandler holds that giving confidential information to someone who was a journalist years ago but has moved on to other pursuits makes it reasonably

---

[17] Nor did Chandler avail himself of the opportunity to develop any evidence that Berlin knew Eringer had ever been anything other than an intelligence operative.

foreseeable that the former journalist will repeat that information many years into the future.

### F. The District Court Properly Considered The Limited Distribution Of The Report And Its "Confidential" Designation.

Chandler concedes that two of the factors relied on by the District Court — the limited dissemination of the report and its designation as confidential — are appropriate considerations for the foreseeability issue, but are "not determinative." Br. at 35, 36. But the District Court never held that they were; it simply considered them as circumstances supporting its decision. It ruled that the report's limited distribution "weighs against finding that Eringer's republication in 2017 was reasonably foreseeable," A423, and that the "confidential" designation "is evidence that the document's author intended for it to remain confidential." *Id.* Chandler's brief does not seriously take issue with those statements.

Neither do the cases on which he relies. In *Unsworth v. Musk*, 2019 U.S. Dist. LEXIS 229076 at *32 (C.D. Cal. Nov. 18, 2019), the defendant's *only* arguments were his experience with reporters and his writing "off the record" at the beginning of an email. The District Court agreed "[t]his may be used as evidence of Defendant's expectation" but was insufficient by itself to grant him summary judgment. In *Tennenbaum v. Ariz. City Sanitary Dist.*, 2013 U.S. Dist. LEXIS 77534 at *37-38 (D. Ariz. June 3, 2013), the court weighed the Defendant's instructions not to publish an allegedly defamatory letter against the facts that **at the time the**

**defendant turned over the letter** "[t]he events … were a matter of public concern, and the letter was widely circulated…."[18]

### G. Summary

Chandler argues that foreseeability is a question of fact for the jury, Br. at 24, but concedes, as he must, that foreseeability can be decided on summary judgment under the routine summary judgment standard. Br. at 25. District of Columbia courts regularly decide foreseeability issues on summary judgment. *See, e.g., Workman v. United Methodist Comm.,* 320 F.3d 259 (D.C. Cir. 2003); *Beckwith v. Interstate Mgmt. Co.,* 82 F. Supp. 3d 255 (D.D.C. 2015); *Bruno v. Western Union Fin. Servs.,* A.2d 713 (D.C. 2009). And courts throughout the country regularly grant summary judgment on foreseeability in defamation cases, including the foreseeability of republication. *E.g., Beroiz v. Wall,* 84 Cal. App.2d 485,497-98, 100 Cal. Rptr. 2d 905,913 (2d Dist. 2000); *MSK EyEs Ltd. V. Wells Fargo Bank,* 546 F.3d 533, 542-44 (8th Cir. 2008). The District Court's decision in this case is similar. It correctly found that there were no disputed factual issues and no reasonable inferences that support a conclusion that Berlin reasonably expected publication of the Limited Report to the British press almost a decade and a half after its completion.

---

[18] In *Yarus v. Walgreen Co.*, 2015 U.S. Dist. LEXIS 28212 at *11 (E.D. Pa. March 6, 2015), the Court merely stated that the plaintiff's theory of liability based on republication was legally actionable.

## II. THE DISTRICT COURT CORRECTLY HELD THAT THE STATUTE OF LIMITATIONS BARS ANY CLAIM BASED ON THE 2003 PUBLICATION OF THE LIMITED REPORT TO ERINGER.

### A. The Statute of Limitations And The Discovery Rule.

The parties agree that the one-year statute of limitations in D.C. Code §12-301(4) governs Chandler's claim for defamation based on Berlin's delivery of the Limited Report to Eringer in 2003. Like every other statute of limitations, §12-301(4) serves important policy objectives. Statutes of limitations " 'protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or the disappearance of witnesses, fading memories, disappearance of documents or otherwise.' " *Hendel v. World Plan Council,* 705 A.2d 656, 665-66 (D.C. 1997) (quoting *United States v. Kubrick,* 444 U.S. 111, 117 (1979)). [19] Statutes of limitations are not "technicalities." *Board of Regents v. Tomanio,* 446 U.S. 478, 487 (1980). They protect citizens' legitimate interests in repose and the courts' interests in accurate factfinding, both of which are threatened if those who sleep on their rights (or "leave the curiosity to others") can file suit years after the events at issue. *See Diamond v. Davis,* 680 A.2d 364, 379 (D.C. 1996) ("We do not think it appropriate

---

[19] For that reason, Chandler's complaints that Berlin no longer possesses documents concerning the Limited Report, *e.g.,* Br. at 12, should be given no weight. Statutes of limitations exist because it is likely that documents will become unavailable as years pass by.

to protect those careless of their rights at the expense of the right of the party accused to defend herself.")

Because Chandler filed this case more than 15 years after Berlin gave the Limited Report to Eringer, any claim arising out of that publication is timely only if there is a basis for tolling the statute of limitations until September 14, 2017, one year before he filed the complaint. Chandler relies upon the discovery rule to toll the statute, but the District Court correctly ruled that the discovery rule does not save his case.

The District of Columbia Court of Appeals has adopted a single standard for all cases in which a plaintiff tries to postpone accrual of any cause of action pursuant to the discovery rule.

> In every case, the plaintiff has a duty to investigate matters affecting her affairs with reasonable diligence under all of the circumstances. Once the plaintiff actually knows, or with the exercise of reasonable diligence would have known, of **some injury, its cause-in-fact, and some evidence of wrongdoing,** then she is bound to file her cause of action within the applicable limitations period measured from the date of her acquisition of her actual or imputed knowledge.

*Diamond v. Davis,* 680 A.2d 364, 381 (D.C. 1996) (emphasis added).

The *Diamond* court emphasized the importance of a plaintiff's duty of diligent investigation: "if a plaintiff has not acquired actual knowledge of a cause of action only because of his failure to meet that duty to investigate, the plaintiff is nevertheless charged with that knowledge." *Id.* at 372. It defined "inquiry notice" as

"that notice which a plaintiff would have possessed after due investigation," and held that "[o]nce either actual or inquiry notice is present, . . . the statute of limitations begins to run as a matter of law." *Id.*

Applying the discovery rule, there are several possible accrual dates for any cause of action arising out of Berlin's 2003 transmission of the Limited Report to Eringer. Berlin has chosen the latest of those dates — November 2015 — as the basis for his statute of limitations argument.[20] By that time, at the latest, Chandler admits actual knowledge of a defamation case against Eringer, and that knowledge gave him inquiry notice of a claim against Berlin for his authorship of the Limited Report.

**B. Chandler Knew Enough To Sue Eringer By November 2015.**

Chandler admitted that he was aware of Eringer's 2009 verified complaint in January 2010, and of Eringer's book and website by November 2015. A442-44. Chandler never has disputed that those documents gave him sufficient information to file an action against Eringer. The complaint, the book, and the website informed him that Eringer accused him of misconduct and asserted under oath that he had documents to support his accusations. A310, ¶13. Chandler knew those charges were

---

[20] Chandler's knowledge of Eringer's charges in 2010 and 2012, A448 and A452, as well as his statement in 2015 that Eringer's charges were "old news" that "has been around for years," A450, all point to earlier accrual dates.

damaging to his reputation and that he could file suit against Eringer to force him to prove or retract the charges. A448.

The undisputed evidence establishes, therefore, that in 2015 he knew everything required by *Diamond* to start the running of the limitations period against Eringer —"some injury," because he knew that Eringer's charges were damaging to his reputation; "its cause-in-fact," because those charges were contained in both Eringer's writings and the documents that Eringer possessed; and "some evidence of wrongdoing," because he believed the charges were deliberately false.

By November 2015, therefore, the one-year statute of limitations on Chandler's defamation cause of action against Eringer started to run.

### C. Chandler Also Knew Enough To Investigate The Author Of The Documents That Eringer Said He Possessed.

Although Chandler has never denied that he knew enough to sue Eringer in 2015, he contends that the limitations period for any claim against Berlin did not commence until May 2018, when he asserts he first learned about Berlin's authorship of the Limited Report. But his argument ignores an important principle of District of Columbia law: a plaintiff may be chargeable with inquiry notice of a potential claim **even if the plaintiff does not know the identity of the defendant.**

The District of Columbia Court of Appeals established that principle in *Estate of Chappelle v. Sanders,* 442 A.2d 157 (D.C. 1982). Plaintiff's decedent in that case was a passenger involved in an auto accident. The driver of the other car gave the

decedent's driver a false name and then left the scene. The decedent's driver was able to get the other car's license number and traced the car to its owner, who denied that her car was involved. *Id.* at 157-58.

The plaintiff sued the driver and the owner after the statute of limitations had run, but argued that the driver's concealment of his identity and the owner's false denial tolled the statute. The Court disagreed:

> We hold that appellees' concealment of their identities did not toll the running of [the] limitations periods. In the circumstances here we are inclined to follow the rationale of those jurisdictions which have held generally that concealment of the identity of liable parties, unlike concealment of the existence of a claim, is insufficient to toll the statute of limitations.

*Id.* at 159 (citing 51 Am. Jur. 2d, *Limitation of Actions,* §148 (1970)).

Because the estate knew the identity of the car's owner, it "could have filed a timely claim against [her] and amended it as pretrial discovery revealed the identity of any other liable parties." 442 A.2d at 159. Thus, even though the plaintiff did not know the driver's name, the plaintiff's knowledge of an injury, its cause in fact, and some evidence of wrongdoing by the driver was sufficient to impose a duty to investigate the identity of the driver and to commence the running of the limitations period.[21] The *Diamond* decision reaffirmed *Chappelle*: "[C]oncealment of the mere

---

[21] Because the plaintiff knew the identity of at least one defendant (the car's owner) the Court did not decide whether the statute would have been tolled in the absence of that information. 442 A.2d at 159 n.4. In this case, Chandler also knew the identity

identity of the defendant [does] not amount to concealment of wrongdoing on the part of the defendant." 680 A.2d at 380 n.14.

In this case, Eringer's sworn statement that he had documents to support his charges, A310, ¶13, informed Chandler that whoever created those documents contributed to the injury to his reputation caused by Eringer's publications. Because Chandler believed that Eringer falsely accused him, any documents supporting Eringer's accusations necessarily would contain statements that Chandler believed were false. Consequently, Chandler's knowledge of the three *Diamond* factors in 2015 encompassed not just Eringer's actions but also the actions of the author(s) of the supporting documents. Chandler knew of some injury (reputational damage), its cause-in-fact (statements in the documents used by Eringer to support his allegations) and some evidence of wrongdoing (belief that any statements supporting Eringer were false). He may not have known who authored the documents, but *Chappelle* and *Diamond* hold that the discovery rule required him to investigate to find out before the statute of limitations expired.

Chandler's brief hypothesizes some reasons why he might not have investigated Eringer's statement that he had documents to support his charges, but cites no evidence that those were the actual reasons for his lack of interest. For

_____

of one potential defendant – Eringer – so the issue reserved in *Chappelle* is of no importance.

example, counsel minimize Eringer's sworn statement that he had documents to support his charges, contending that Eringer said that he had documents about other persons whom he investigated. Br. at 50. But the existence of documents about others is no reason to believe that Eringer did not have documents about Chandler. The statement that "Eringer investigated" someone and has documents to prove his charges hardly negates Eringer's reliance on those documents. On the contrary, it shows that the documents were an important part of the investigation.

In addition, as the District Court noted, Eringer's book continually refers to "we" when describing his efforts against the Chandlers, putting the reader on notice that people other than Eringer were involved in the Chandler investigation. A492-93. Counsel's claim that this is the "royal we," Br. at 50-51, raised for the first time on appeal, is frivolous. Even a cursory look at Eringer's book shows that he regularly uses "I" when referring to himself, and "we" in its normal plural (and non-royal) meaning. *See, e.g.,* Supp. App. at 17-32.[22] In fact, Chandler's comment about Eringer's website was "Shame on the people involved," leaving no doubt that he knew others contributed to Eringer's work. A450.

Chandler's own words, not counsel's arguments, give his real reasons for not investigating. He and his brother wanted to "carry on with our lives and leave the

---

[22] For example. Eringer said "[w]e discussed various options with the Prince," Supp. App. 26, when describing a meeting that both he and his deputy attended. *Id.* at 23.

curiosity to others," A452, and did not want to bother with "old news [that] has been around for years." A450. This Court should give no weight to the speculative arguments in his brief, which are unsupported *post hoc* rationalizations of counsel.

The District Court's holding that the discovery rule "does not allow [a plaintiff] to turn a blind eye when an investigation would otherwise turn up evidence of a co-defendant's transgressions," A495, is consistent with *Chappelle.* As this Court stated in *Jankovic v. International Crisis Group,* 494 F.3d 1080, 1086 (D.C. Cir. 2007): "The *Chappelle* rule remains the law of the District of Columbia." (Citing *Diamond* and *Cevenini v. Archbishop of Washington,* 707 A.2d 768, 773-74 (D.C. 1998).) Pursuant to that rule, Chandler's duty to investigate Eringer's disclosure that he had supporting documents arose no later than November 2015, when he was aware of Eringer's publications and knew that there were documents supporting Eringer's charges. He may not have known who authored the documents, but at that point the *Chappelle* rule required him to investigate to find out who those authors were.

### D. In the Alternative, the *Fitzgerald* Rule Applies.

This Court's decision in *Fitzgerald v. Seamans,* 553 F.2d 220 (D.C. Cir. 1977), complements the *Chappelle* rule and is an independent basis for concluding that Chandler's duty to investigate arose no later than November 2015. The plaintiff in that case was a civilian Air Force employee who alleged that various government

officials conspired to retaliate against him for unfavorable congressional testimony. This Court ruled that his action was time barred, rejecting his arguments based on the discovery rule. Its ruling extended not only to the Air Force officials whom he knew had retaliated against him but also to their subordinates who, unknown to him, supplied false information to those officials.

> Appellant had failed to bring timely action against the higher Air Force and Defense officials, although he knew of their actions and statements and had at least constructive knowledge of grounds for the late lodged suit; it would be anomalous and unjust to allow appellant to begin an action against lesser fry merely because their identity and participation were earlier unknown. The matter would stand differently if appellant had proceeded with diligence within the 3-year period by suing those conspirators known to him at the time, and later sought to add other participants whose identity he learned in the course of that suit.

*Id.* at 229.

In *Diamond,* the Court of Appeals restated and adopted the *Fitzgerald* rule: "the plaintiff's knowledge of wrongdoing on the part of one defendant [does] not cause accrual of his action against another, unknown defendant responsible for the **same harm**, **unless the two defendants [are] closely connected, such as in a superior-subordinate relationship.**" 680 A2d at 380 (emphasis added).

*Fitzgerald* and *Chappelle* describe two different circumstances in which the accrual of a cause of action against one defendant results in the accrual of a cause of action against another, unidentified defendant. *See Diamond,* 680 A.2d at 380 n.14. If a plaintiff knows of the "existence of all defendants guilty of the wrongdoing as

the result of the wrongful act," the cause of action accrues under *Chappelle,* even if the plaintiff does not know all defendants' identities. *Id*. Under *Fitzgerald,* however, if the plaintiff does not know of the existence of another person who caused her injury, then the cause of action does not accrue unless that other person is "closely connected" to an identified defendant. "In such circumstances, it is not merely the *identity* of the unknown wrongdoers, but their very *existence* that is concealed from the plaintiff." *Id.* (Emphasis in original.).

As discussed above, Berlin was a known, but unidentified, defendant eligible for the *Chappelle* rule. If, however, he is regarded as an unknown defendant, he is eligible for the *Fitzgerald* rule, provided that he and Eringer were "closely connected" and are alleged to be responsible for the "same harm." As discussed below, the record shows that both conditions are satisfied.

### E. Berlin and Eringer Were "Closely Connected."

This Court need look no further than the complaint in this case to find the close connection required by *Fitzgerald*. Chandler does not claim that Berlin was some independent researcher whose work Eringer somehow stumbled upon. Instead, he asserts that Eringer hired Berlin to prepare the Limited Report and that Eringer and Berlin worked together to create a false report to entice Prince Albert to pay for additional investigations of the Chandler brothers. Complaint, ¶¶3-4, A57. See also ¶¶ 39-41 and 61 of the complaint, A65, 71; Br. at 10.

In *Fitzgerald,* lower-level officers provided false information to their superiors, who used that information to damage the plaintiff's reputation. That is an exact parallel to Chandler's allegations that Berlin gave false information to Eringer, who used it to damage Chandler's reputation. Chandler attempts to distinguish *Fitzgerald* on the ground that the lower-level officials were employees, while Berlin was an independent contractor. But that is the proverbial distinction without a difference. The **actions** of the employees (supplying false information directly to their superiors) were the same as Berlin's alleged actions (supplying supposedly false information directly to Eringer). The legal difference between employees and independent contractors is irrelevant. A 489.

Chandler incorrectly compares Berlin to a White House aide who was denied summary judgment in *Fitzgerald.* But the White House aide had no role in the dissemination of false information about the plaintiff, nor did he interact with any Air Force officials. Instead, after the Air Force announced the plaintiff's dismissal, he wrote a memo to various White House officials advocating that the plaintiff should not be rehired. 553 F.2d at 225. He lacked a close connection to the Air Force defendants because his "opposition to moves within the White House to find another government job for Fitzgerald," *id.* at 229, was a different facet of the alleged conspiracy.

Chandler has abandoned his argument, discussed by the District Court at A490, that only persons in a superior-subordinate relationship are eligible for the *Fitzgerald* rule. Instead, he presents a new argument on appeal, contending that a close connection is established by referring to several supposedly exclusive factors, although he cites not a single case supporting that claim. Br. at 47 (arguing that Berlin and Eringer did not share an "ongoing relationship," that they are not officers, officials, or members of the same "organization, group, or company," and are "not even members of the same industry or profession.") But courts have found parties eligible for the *Fitzgerald* rule even if they did not satisfy those criteria. *E.g., Gardel v. SK&A Structural Eng'rs PLLC.,* 286 F.Supp.3d 120, 125-28 (D.D.C. 2017) (plaintiff's knowledge of a claim against a property owner commenced the statute of limitations against both an engineering company and a construction company; no ongoing relationship, as those companies worked only on one project). In any event, Eringer was an intelligence operative and Berlin is an investigator, part of a similar "industry or profession."

**F. In November 2015, The Alleged Damage to Chandler's Reputation From Eringer's Work and the Limited Report Was The "Same Harm."**

Chandler also argues that the *Fitzgerald* rule is inapplicable because Eringer's republication of the Limited Report in 2017 caused a "different harm" than the harm caused by Berlin's publication of the Limited Report to Eringer in 2003. Br. at 42-

43. That assertion misses the point. Our statute of limitations argument focuses on Chandler's awareness in **November 2015** of harm to his reputation from Eringer's publications. By then, Chandler was aware of the harm to his reputation from Eringer's three publications. The relevant question under *Fitzgerald,* as explained in *Diamond,* is whether Berlin's Limited Report and Eringer's publications were responsible for that "same harm" in 2015.

Plaintiff's complaint again provides the answer. According to Chandler, Eringer based his charges on Berlin's report. *E.g.,* A69, ¶54 (Eringer used the information from Berlin's report "as the basis" for his own report containing his charges); A69, ¶56 (Eringer's report "repeats" the claims in Berlin's report); A72, ¶65 (Berlin's report is the apparent "source" of some statements in Eringer's report); A77, ¶80 (same). *See also* Br. at 11 ("Eringer used the [Limited Report] to publish his own false allegations" about Chandler). Indeed, Chandler himself declared under oath that "accusations in the Eringer report originated with the author of the [Limited Report]." A285.

If the Limited Report is the basis for Eringer's charges, it follows that it is also the basis for any repetition of those charges and is therefore responsible for any harm caused by that repetition. Thus, in November 2015, when Chandler knew that his reputation had been harmed by Eringer's publication of his allegations on three separate occasions, Chandler's theory of the case compels the conclusion that

Berlin's report (the alleged "basis" and "source" of those allegations) was also responsible for that harm.

The discovery rule does not permit a plaintiff who is aware of an injury, its cause and evidence of wrongdoing to wait to see if additional harm occurs before filing suit. *Nelson v. American Nat'l Red Cross,* 26 F.3d 193, 197 (D.C. Cir. 1994) (" 'We know of no precedent for the position that a plaintiff whose action has accrued, and who has already suffered grievous injury, may defer suit until further complications develop.' ") (quoting *Colbert v. Georgetown Univ. Hosp.,* 641 A.2d 469, 474 (D.C. 1994) (*en banc*). Thus, Chandler's knowledge in 2015 triggered his duty to investigate the source of Eringer's charges, *i.e.,* the documents that Eringer possessed.

The District Court held that Eringer's repetition of his allegations in 2009, 2014, and 2015 caused a different harm than the initial publication of the Limited Report in 2003. But in applying *Fitzgerald,* the relevant question is whether the Limited Report contributed to the harm in 2015, regardless of any harm it also may have caused in 2003. The District Court's holding that Chandler "easily could have uncovered" the Limited Report based on what he knew in 2015, A495, recognizes that the Limited Report contributed to whatever reputational harm Chandler suffered in 2015.

### G. The District Court Correctly Held That a Reasonable Investigation by Chandler Would Have Revealed The Limited Report.

The District Court concluded that if Chandler filed a timely suit against Eringer, the "ordinary tools of discovery," A490, would have revealed the Limited Report and Berlin's role in its creation. The Court concluded that, by failing to file suit and deciding to "leave the curiosity to others," A452, Chandler failed to undertake a reasonable investigation. As a result, he is charged with knowledge of what the investigation would have revealed, *i.e.,* the Limited Report and its author.[23] *See Diamond,* 380 A.2d at 372.

Both *Chappelle* and *Fitzgerald* recognized that the required reasonable investigation to ascertain the identity of an unknown potential defendant includes using discovery in an action against a known defendant. *Chappelle,* 442 A.2d at 159 ("appellant could have filed a timely claim against [the car's owner] and amended it as discovery revealed the identity of any other liable parties"); *Fitzgerald,* 553 F.2d at 229 (result would have been different if plaintiff sued known defendants "and later sought to add other participants whose identity he learned in the course of that suit.") *Cf. Brin v. S.E.W. Investors,* 702 A.2d 784, 794, 795 (D.C. 2006) ("it is reasonable to expect that the plaintiff, by filing suit, may take advantage of the ample discovery devices now available in litigation to round out the proof of tortious misconduct.")

---

[23] Chandler asserts that the Limited Report by itself was all that he needed to deduce who its author was. A285.

49

Chandler contends that a party need not file a lawsuit to satisfy the duty of reasonable diligence, Br. at 52, but he relies upon inapposite cases from other jurisdictions. In *Baskin v. Hawley,* 807 F.2d 1120 (2d Cir. 1986), the plaintiff, a union laborer, was denied a pension because his former employer and his union falsely told him that the employer had not been a party to a collective bargaining agreement. The Second Circuit tolled the applicable statutes of limitations (under Connecticut law and federal labor law) stating that "reasonable diligence does not require a person to commence a lawsuit in order to procure court-ordered discovery of concealed facts." *Id.* at 1131. The "concealed facts" were that the employer and union lied when they said that the employer was not a party to the collective bargaining agreement. Thus, if that case arose under District of Columbia law the statute of limitations would not have started to run because the plaintiff did not have evidence of wrongdoing, as required by *Diamond*.

In *Locke v. Allstate Ins. Co.,* 1998 U.S. App. LEXIS 7816 (10th Cir. 4/22/98) (applying Oklahoma law) the plaintiff alleged that her insurer unlawfully eliminated hailstorm coverage from her policy. A state agency permitted the change but required the insurer to obtain a signed acknowledgement from the policyholder for the exclusion to take effect. The insurer concealed that requirement from the policyholder, who had not signed any acknowledgment. The court held that the statute of limitations should have been tolled until the policyholder learned about the

concealment. "We are not persuaded that reasonable diligence requires the commencement of a lawsuit in order to uncover concealed facts." *Id.* at *9-*10 (citing *Baskin*). There, too, the "concealed facts" had nothing to do with the identity of the defendant. The plaintiff knew who her insurer was but did not know that the insurer concealed evidence of its wrongdoing.

*Baskin* and *Locke* say nothing about what constitutes a reasonably diligent investigation about the identity of a possible co-defendant when the plaintiff knows that he has a claim against an identified defendant such as Eringer. Under District of Columbia law, *Chappelle* and *Fitzgerald* hold that such an investigation includes a lawsuit against the known defendant.[24]

Chandler also speculates that a suit against Eringer may not have yielded evidence of the Limited Report. Of course, he can only speculate due to his own decision to forgo a lawsuit in favor of "carry[ing] on with our lives and leav[ing] the curiosity to others." A452. Having caused the uncertainty, Chandler is in no position

---

[24] The other cases cited by Chandler on this point also are unavailing. In *Foltz v. U.S. News and World Report,* 627 F. Supp. 1143 (D.D.C. 1986), the court said that, while a plaintiff does not have to file suit on a "hunch," "once he has perceived some degree of injury, he is put under a duty to exercise due diligence to inquire further as to a possible claim." *Id.* at 1150. By November 2015, the facts known to Chandler were sufficient to put him under that duty. *United States v. Rice,* 727 Fed. Appx. 697 (D.C. Cir. 2018), a 28 U.S.C. §2255 proceeding, has nothing to do with the commencement of the limitations period against an unidentified defendant in a tort case.

to take advantage of it by asking this Court to guess what might, or might not, have happened had he sued.

In any event, Chandler's speculation has no foundation in the record. He first proposes that any claim arising from statements in Eringer's 2009 verified complaint would fail at the motion to dismiss stage due to a judicial proceedings privilege. Br. at 53. No privilege would attach to his book and website, however, and he does not even argue that a suit over those publications would fail to survive a dismissal motion. Moreover, Chandler actually considered suing Eringer about the allegations in the 2009 complaint as he believed that the complaint was being disseminated beyond the court and therefore not subject to the judicial proceedings privilege.[25] *See Bochetto v. Gibson*, 580 A.2d 67, 73 (Pa. 2004) (judicial complaint faxed to a reporter not protected by the judicial privilege).

Incredibly, Chandler next argues that "there is no guarantee that Eringer would have possessed documents revealing the existence of the [Limited Report] and Defendants' authorship thereof." Br. at 53. But this case began when, according to Chandler, Eringer gave the Limited Report to the British press, and Chandler, relying only upon the text of the Limited Report, deduced that Berlin authored it. A285. Chandler's brief does not explain what additional "guarantee" of Eringer's

---

[25] "Clearly this Court document is being publicly circulated if Jonathan McDonnell has a copy." A448.

52

possession of the report is necessary. The argument based on Defendants' discovery responses, Br. at 53-54, also misses the mark. It makes no difference what documents Berlin did or didn't have, since Chandler admits that the Limited Report by itself is the source of his claims.

Finally, counsel's failure to locate Eringer for 3 ½ months in 2019, *see* Br. at 54 (citing A478-80), says nothing about Eringer's whereabouts in 2015 or 2016 when Chandler could have sued him. Eringer's counsel admits that he had an address for a residence that Eringer sold as recently as March 2019, A478, suggesting that earlier efforts to locate Eringer would have succeeded. Counsel also speculated that Eringer may be monitoring this case and perhaps tried to avoid service of a deposition subpoena. A480. Of course, there would have been no ongoing litigation to monitor in 2015 or 2016, and no reason for Eringer to be on the lookout for a summons at that time. The *Sunday Times* also was able to locate Eringer to provide comments for its December 2017 and May 2018 stories about the 87-page "dossier" and the debate in Parliament. A158, A216. There is every reason to believe that Chandler could have found him as well.

### H. Summary

There are often valid reasons for deciding not to pursue a lawsuit against a known defendant. But that decision has consequences for both the known defendant and any other defendant whose identity would have been revealed if the plaintiff

filed a timely suit. Chandler changed his mind about "leav[ing] the curiosity to others," but, according to the one-year statute of limitations and the discovery rule, his decision came too late.

## CONCLUSION

For the reasons stated above, the District Court's judgment should be affirmed.

Respectfully submitted,

**/s/ John P. Dean**
John P. Dean
Steven M. Oster

**OSTER McBRIDE PLLC**
1320 19th Street, N.W.
Suite 601
Washington, D.C. 20036
(202) 596-5291

soster@ostermcbride.com
johndean8@aol.com

*Counsel for Appellees*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,665 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

**/s/ John P. Dean**
John P. Dean
Attorney for Appellees
Dated: July 29, 2020

# CERTIFICATE OF SERVICE

I hereby certify that I caused this document to be filed using the Court's electronic filing system, thereby serving all counsel of record.

**/s/ John P. Dean**
John P. Dean
Attorney for Appellees
Dated: July 29, 2020