No. 20-7020

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CHRISTOPHER CHANDLER

*Plaintiff-Appellant,*

v.

DONALD BERLIN; INVESTIGATIVE CONSULTANTS, INC. AND
INVESTIGATIVE CONSULTANTS, INC. OF WASHINGTON DC

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia
(Case No. 1:18-cv-02136-APM)

## PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT

THOMAS A. CLARE, P.C.
JOSEPH R. OLIVERI
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
joe@clarelocke.com

*Attorneys for Plaintiff-Appellant*

June 15, 2020

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Plaintiff-Appellant Christopher Chandler respectfully states as follows:

## A.    Parties and Amici

<u>Plaintiff-Appellant</u>:  Christopher Chandler.

<u>Defendants-Respondents</u>:  Donald Berlin; Investigative Consultants, Inc.; and Investigative Consultants, Inc. of Washington DC.

There are no amici in this case to date.

## B.    Rulings Under Review

Plaintiff-Appellant seeks review of the following rulings by District Court Judge Hon. Amit P. Mehta:

1.    April 3, 2019 Memorandum Opinion and Order granting in part Defendants' Motion for Summary Judgment (DE 24, A416-26; unpublished);

2.    January 30, 2020 Memorandum Opinion (DE 37, A481-96; to be published at *Chandler v. Berlin*, --- F. Supp. 3d ---- (D.D.C. 2020)); and

3.    January 30, 2020 Order granting Defendants' Motion for Summary Judgment (DE 38; A497; unpublished).

## C.    Related Cases

This case has not previously been before this Court or any other court other than the district court below.  The undersigned counsel are not aware of any related cases pending in this Court or any other court.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a)(1), Plaintiff-Appellant Christopher Chandler ("Mr. Chandler") respectfully submits that oral argument would materially assist the decisional process and requests oral argument in this case. This case presents an issue of fundamental importance—Mr. Chandler's "right to the protection of his own good name," which the Supreme Court has recognized is a "basic ... right" of "our constitutional system," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974)—and presents multiple critical errors of law that have improperly denied Mr. Chandler his day in court to protect that right.

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES................................................................................ vi

INTRODUCTION ............................................................................................... 1

STATEMENT OF JURISDICTION .................................................................... 2

STATEMENT OF THE ISSUES ......................................................................... 3

STATUTES AND REGULATIONS .................................................................... 4

STATEMENT OF THE CASE ............................................................................ 4

    A.    Statement of Facts.................................................................................. 4

        1.    Defendant Donald Berlin Founds Research and Intelligence-Gathering Firm ICI and Boasts Expertise in Developing Background Reports on People and Awareness of How His Clients Use Those Reports. ...................................................... 6

        2.    Non-Party Robert Eringer Separately Develops a Career as a Prolific Author, Tabloid Journalist, and Self-Styled Spymaster. ................................................................................... 7

        3.    Eringer Contracts at Arms'-Length with Defendants for a Background Report on Mr. Chandler, and Defendants Manufacture a False and Defamatory Dossier and Publish It to Eringer. ................................................................................... 9

        4.    Eringer Uses the Dossier to Publish His Own Works About Mr. Chandler, While He and Defendants Keep the Dossier Secret for Nearly Two Decades................................................. 11

        5.    Eringer Republishes the Dossier to the British Media, and Mr. Chandler, Through Extraordinary and Above-and-Beyond Investigatory Efforts, Discovers Its Existence and Authorship by Defendants. ................................................... 14

      6.    Mr. Chandler Demands That Defendants Retract the False and Defamatory Dossier, But Defendants Refuse to Do So.... 16

   B.    Course of Proceedings Below ............................................ 17

SUMMARY OF ARGUMENT ................................................................. 20

STANDARD OF REVIEW ....................................................................... 22

ARGUMENT ........................................................................................... 23

I.    The District Court Reversibly Erred In Holding As A Matter of Law That It Was Not Reasonably Foreseeable To Defendants That A Tabloid Journalist And Prolific Author Would Republish Defendants' Defamatory Dossier ............................................................................................. 23

   A.    The District Court Failed to Credit Evidence That Made It Reasonably Foreseeable to Defendants That Eringer Would Republish Their Defamatory Dossier. ................................. 25

   B.    The District Court's Reasons for Holding That as a Matter of Law It Was Unforeseeable to Defendants That Eringer Would Republish the Dossier Do Not Support That Holding. ........................................ 32

II.   The District Court Reversibly Erred In Holding As A Matter of Law That Mr. Chandler's Defamation Claim Based On Defendants' Secret 2003 Publication Of The Dossier To Eringer Is Time-Barred Despite Application Of The Discovery Rule. .......................................................... 38

   A.    The District Court Reversibly Erred in Holding That Mr. Chandler's Knowledge of Defamation Claims Against Eringer Caused His Claim Against Defendants to Accrue. ........................... 41

       1.    *Fitzgerald* Is Inapplicable Here Because—as Even the District Court Recognized—Mr. Chandler's Potential Claims Against Eringer and Defendants Arose from Different Harms. ...................................................................... 42

       2.    Even if *Fitzgerald* Were Applicable, Eringer and Defendants Are Not "Closely Connected" Such That Mr. Chandler's

Knowledge of Claims Against Eringer Could Accrue His
Claims Against Defendants. .................................................... 43

B.    The District Court Reversibly Erred in Holding That Mr. Chandler,
Through the Exercise of Reasonable Diligence, Could and Would
Have Discovered His Claim Against Defendants More Than a Year
Before He Filed This Case. ................................................ 48

CONCLUSION ............................................................................. 55

CERTIFICATE OF COMPLIANCE ...................................................... 56

CERTIFICATE OF SERVICE ............................................................. 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................... 23

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
    654 F.3d 462 (3d Cir. 2011), *as amended* (Oct. 7, 2011) ....................... 20, 24, 32

*Associated Producers, LTD v. Vanderbilt Univ.*,
    76 F. Supp. 3d 154 (D.D.C. 2014) ...................................................... 39

*Ayres v. Ocwen Loan Serv., LLC*,
    129 F. Supp. 3d 249 (D. Md. 2015) .................................................... 39

*Bailey v. Astrue*,
    No. 09-cv-174, 2009 WL 3334893 (W.D. Ky. Oct. 15, 2009),
    *aff'd sub nom. Bailey v. Comm'r of Soc. Sec.*,
    413 F. App'x 853 (6th Cir. 2011) ...................................................... 51

*Bailey v. Comm'r of Soc. Sec.*,
    413 F. App'x 853 (6th Cir. 2011) ...................................................... 51

*\*Baskin v. Hawley*,
    807 F.2d 1120 (2d Cir. 1986) ...................................................... 22, 52

*Bement v. N.Y.P. Holdings, Inc.*,
    307 A.D.2d 86 (N.Y. App. Div. 2003) ................................................ 38

*Bolduc v. Bailey*,
    586 F. Supp. 896 (D. Colo. 1984) ...................................................... 31

*Brin v. S.E.W. Inv'rs*,
    902 A.2d 784 (D.C. 2006) ............................................................... 23

*Bryan v. News Corp.*,
    No. B275567, 2018 WL 720057 (Cal Ct. App. Feb. 6, 2018)...................... 27, 35

Authorities upon which we chiefly rely are marked with asterisks.

*Crabbs v. Scott,
   800 F. App'x 332 (6th Cir. 2020) ....................................... 20, 24, 33, 34

Davis v. Costa-Gavras,
   580 F. Supp. 1082 (S.D.N.Y. 1984) ................................................. 28

*Diamond v. Davis,
   680 A.2d 364 (D.C. 1996) ............................... 4, 39, 40, 41, 42, 45, 46

District of Columbia v. Carlson,
   793 A.2d 1285 (D.C. 2002) ............................................................. 24

Eramo v. Rolling Stone, LLC,
   209 F. Supp. 3d 862 (W.D. Va. 2016)............................................. 24

Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.,
   774 A.2d 332 (D.C. 2001) ............................................................... 53

*Fitzgerald v. Seamans,
   553 F.2d 220 (D.C. Cir. 1977)..................... 3, 40, 41, 42, 43, 44, 45, 46, 47, 48

Foltz v. U.S. News & World Report, Inc.,
   627 F. Supp. 1143 (D.D.C. 1986)..................................................... 52

Foretich v. Glamour,
   753 F. Supp. 955 (D.D.C. 1990)....................................................... 42

Founding Church of Scientology of Wash., D.C. v. Am. Med. Ass'n,
   377 N.E.2d 158 (Ill. App. Ct. 1978) ................................................ 35

Galligan v. Detroit Free Press,
   --- F. Supp. 3d ----, 2020 WL 475341 (E.D. Mich. Jan. 29, 2020) ................... 26

Gardel v. SK & A Structural Eng'rs PLLC,
   286 F. Supp. 3d 120 (D.D.C. 2017).................................................. 48

George v. Leavitt,
   407 F.3d 405 (D.C. Cir. 2005)......................................................... 23

Geraci v. Probst,
   15 N.Y.3d 336 (N.Y. 2010) ....................................................... 27, 35

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ............................................................................. ii

*Green v. Cosby*,
  138 F. Supp. 3d 114 (D. Mass. 2015)................................................. 34

*Hobson v. Wilson*,
  737 F.2d 1 (D.C. Cir. 1984)........................................................ 41, 42

*HV Assocs. LLC v. PNC Bank, N.A.*,
  No. 17-cv-8128, 2018 WL 1731346 (D.N.J. Apr. 10, 2018) ............ 35

*Ingber v. Ross,|*
  479 A.2d 1256 (D.C. 1984) ............................................................. 29

*Iyoha v. Architect of the Capitol*,
  927 F.3d 561 (D.C. Cir. 2019)......................................................... 22

*Jankovic v. Int'l Crisis Grp.*,
  494 F.3d 1080 (D.C. Cir. 2007)....................................................... 42

*Keeton v. Hustler Mag., Inc.*,
  465 U.S. 770 (1984) ........................................................................ 42

*Kubicki v. Medtronic, Inc.*,
  293 F. Supp. 3d 129 (D.D.C. 2018)................................................. 48

*Liberty Lobby, Inc. v. Anderson*,
  746 F.2d 1563, 1567 (D.C. Cir. 1984),
  *vacated on other grounds*, 477 U.S. 242 (1986) ...................... 8, 19, 27

*Liverpool v. Con-Way, Inc.*,
  No. 08-cv-4076, 2009 WL 1362965 (E.D.N.Y. May 15, 2009)......... 31

*Locke v. Allstate Ins. Co.*,
  145 F.3d 1346, 1998 WL 193135 (10th Cir. 1998)............................ 52

*McFadden v. Wash. Metro. Area Transit Auth.*,
  204 F. Supp. 3d 134 (D.D.C. 2016)................................................. 39

*Meyers v. Levinson*,
  No. 02-cv-9, 2005 U.S. Dist. LEXIS 42799 (E.D. Va. July 26, 2005) ............. 37

*Moore v. Allied Chem. Corp.*,
   480 F. Supp. 364 (E.D. Va. 1979) .............................................................. 28, 29

*Murphy v. Boston Herald, Inc.*,
   865 N.E.2d 746 (Mass. 2007)................................................................... 28, 29

*Nader v. Dem. Nat'l Comm.*,
   567 F.3d 692 (D.C. Cir. 2009)........................................................................ 48

*Napoleon v. Heard*,
   455 A.2d 901 (D.C. 1983) ............................................................................... 33

*Oparaugo v. Watts*,
   884 A.2d 63 (D.C. 2005) ........................................................................... 20, 23

*Paavola v. United States*,
   --- F. Supp. 3d ----, 2020 WL 2064789 (D.D.C. Apr. 29, 2020)................ 20, 24

*Rawlins v. Kansas*,
   714 F.3d 1189 (10th Cir. 2013) ...................................................................... 51

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ........................................................................................ 22

*Richards v. Mileski*,
   662 F.2d 65 (D.C. Cir. 1981)........................................................................... 48

*Sandza v. Barclays Bank, PLC*,
   151 F. Supp. 3d 94 (D.D.C. 2015).................................................................. 48

*Saylab v. Don Juan Rest., Inc.*,
   332 F. Supp. 2d 134 (D.D.C. 2004)........................................................... 33, 39

*Schneider v. United Airlines, Inc.*,
   208 Cal. App. 3d 71 (Cal. Ct. App. 1989)....................................................... 26

*Sears, Roebuck & Co. v. Ulman*,
   412 A.2d 1240 (Md. 1980) .............................................................................. 39

*Seed Co. v. Westerman*,
   832 F.3d 325 (D.C. Cir. 2016)......................................................................... 23

*Shepard v. Nabb*,
  581 A.2d 839 (Md. Ct. Spec. App. 1990)................................................ 32, 33, 39

*Smith v. Hope Vill., Inc.*,
  481 F. Supp. 2d 172 (D.D.C. 2007)................................................... 24

*Stoe v. Barr*,
  --- F.3d ----, 2020 WL 2781649 (D.C. Cir. May 29, 2020).............................. 22

*\*Tavoulareas v. Piro*,
  759 F.2d 90 (D.C. Cir. 1985),
  *vacated in part on other grounds on reh'g*, 763 F.2d 1472 (D.C. Cir. 1985),
  *and aff'd on reh'g*, 817 F.2d 762 (D.C. Cir. 1987) ......................... 21, 24, 25, 32

*Tennenbaum v. Ariz. City Sanitary Dist.*,
  No. 10-cv-2137, 2013 WL 2422684 (D. Ariz. June 3, 2013)............................ 36

*Tumbarella v. Kroger Co.*,
  271 N.W.2d 284 (Mich. Ct. App. 1978)..................................................... 28, 29

*United States v. Rice*,
  727 F. App'x 697 (D.C. Cir. 2018) .................................................... 52

*Unsworth v. Musk*,
  No. 18-cv-8048, 2019 WL 8220721 (C.D. Cal. Nov. 18, 2019) ................. 26, 36

*Weddington v. United Nat'l Ins. Co.*,
  46 F. App'x 224 (9th Cir. 2009)................................................... 24, 32

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ................................................................. 53

*Wiggins v. Creary*,
  475 So. 2d 780 (La. Ct. App.) ........................................................ 26

*Wiggins v. Creary*,
  478 So. 2d 910 (La. 1985) ............................................................. 26

*Wright v. Bachmurski*,
  29 P.3d 979 (Kan. Ct. App. 2001) .................................................... 25

*Yarus v. Walgreen Co.*,
  No. 14-cv-1656, 2015 WL 1021282 (E.D. Pa. Mar. 6 2015)............................ 37

**Statutes**

28 U.S.C. § 1291 ................................................................................ 3

28 U.S.C. § 1332 ................................................................................ 2

D.C. Code § 12-301 ..................................................................... 4, 39

D.C. Code § 45-401 ......................................................................... 33

**Rules**

Fed. R. App. P. 34 ............................................................................. ii

Fed. R. App. P. 4 .............................................................................. 2

Fed. R. Civ. P. 12 ............................................................................ 18

Fed. R. Civ. P. 56 ............................................................................ 23

**Other Authorities**

*Chicago Manual of Style* (15th ed. 2003) .................................... 51

Restatement (Second) of Torts § 576 ........................... 21, 28, 29, 35, 36

Restatement (Second) of Torts § 577A ............................................ 42

## <u>GLOSSARY</u>

Defendant ICI                    Defendant Investigative Consultants, Inc.

## <u>INTRODUCTION</u>

This appeal presents two straightforward questions of law against the factual backdrop of false and sensational accusations of Russian espionage and involvement in organized crime.

***First***, is it at least potentially reasonably foreseeable to a sophisticated defendant who publishes a sensational dossier accusing a person of espionage and criminal activity to a known freelance journalist, tabloid reporter, and "prolific author" that the journalist may republish the defamatory allegations in that dossier? The answer, under settled law, is yes. But, as explained herein, the district court granted Defendants' Motion for Summary Judgment based on its holding, as a matter of law, that it was ***un***foreseeable to Defendants-Appellees that the tabloid journalist and "prolific author" to whom they published a dossier making such allegations— who Defendants knew requested the production of a dossier in order to use the information therein—might republish those allegations. In so holding, the court reversibly erred.

***Second***, does a district court err by holding, as a matter of law, that a plaintiff's knowledge of a potential defamation claim against one person causes his potential defamation claim against a ***different*** person based on a ***different*** publication at a ***different*** time to a ***different*** audience that caused the plaintiff ***different*** harm to accrue for statute of limitations purposes under the District of Columbia discovery

rule where (1) the only link between the two putative defendants is that they entered into an arms'-length transaction whereby one authored and then secretly published to the other a defamatory dossier about the plaintiff, and (2) record evidence demonstrates that there were no sources or documents from which the plaintiff, through the exercise of reasonable diligence, could have learned of the dossier's existence or the identity of its author until less than one year before filing suit? Again, the answer, under settled law, is yes. But, as explained herein, the district court, in granting Defendants' Renewed Motion for Summary Judgment, held the opposite, and in so doing it reversibly erred in multiple ways, thereby depriving Plaintiff-Appellant Christopher Chandler of his day in court to set the record straight about Defendants' false and highly damaging accusations against him.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332 because there was (and is) complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. The district court entered final judgment for Defendants on January 30, 2020. (A497.)[1] Under Federal Rule of Appellate Procedure 4(a)(1)(A), Plaintiff-Appellant timely filed a Notice of Appeal on February 27, 2020, fewer than 30 days after the district court's final

---

[1] References to the Public Appendix are in the form "(A[page number])"; references to the Sealed Appendix Supplement are in the form "(SA[page number])."

2

judgment.  (A498-500.)   This Court has jurisdiction to hear Plaintiff-Appellant's appeal from that final judgment under 28 U.S.C. § 1291.

### STATEMENT OF THE ISSUES

1.     Whether the district court erred in granting in part Defendants' Motion for Summary Judgment and holding as a matter of law that it was not reasonably foreseeable to Defendants that a third-party tabloid journalist and prolific author— who hired Defendants to put together a defamatory dossier falsely accusing Mr. Chandler of sensational crimes—would republish the contents of that dossier.

2.     Whether the district court erred in granting Defendants' Renewed Motion for Summary Judgment and holding as a matter of law that Mr. Chandler's libel claim against Defendants based on their secret publication of a defamatory dossier was time-barred under the discovery rule, *see Fitzgerald v. Seamans*, 553 F.2d 220, 229 (D.C. Cir. 1977), based solely on Mr. Chandler's knowledge that he could have brought ***different*** claims against a ***different*** person based on ***different*** publications at a ***different*** time causing him ***different*** harm, where (1) Defendants intentionally concealed their authorship and publication of the dossier; (2) Mr. Chandler had never heard of Defendants and had no reason to suspect that a dossier existed or Defendants' authorship thereof until less than one year before he filed this lawsuit; (3) Defendants are not "closely connected" so as to warrant an exception to the general rule that "the plaintiff's knowledge of wrongdoing on the

part of one [person] d[oes] not cause accrual of his action against another, unknown [person]," *Diamond v. Davis*, 680 A.2d 364, 380 (D.C. 1996); and (4) there is no evidence that a reasonable investigation would have led Mr. Chandler to have learned that Defendants had secretly published a dossier and there is substantial evidence suggesting that it would not have.

## STATUTES AND REGULATIONS

One statute is relevant to this appeal:  D.C. Code § 12-301(4).  The statute provides as follows:

D.C. Code § 12-301

Except as otherwise specifically provided by law, actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues: ... (4) for libel, slander, assault, battery, mayhem, wounding, malicious prosecution, false arrest or false imprisonment -- 1 year[.]

## STATEMENT OF THE CASE

### A.    Statement of Facts

This case arises from the publication and foreseeable republication of a false, defamatory, and sensational dossier accusing Plaintiff-Appellant Christopher Chandler of, among other things, involvement in Russian espionage, a "massive money-laundering scheme," and organized crime (the "Dossier") that was authored by Defendants Donald Berlin and his firm, Investigative Consultants, Inc. ("ICI,"

collectively "Defendants").    (A57, A65-66, ¶¶4-5, 39-42; A83-116; A349-82.)[2]

Specifically, this case arises from Defendants' publication of the Dossier in 2003 to

"prolific author," tabloid journalist, and self-described "Spymaster" Robert Eringer,

who contracted with Defendants for background research on Mr. Chandler and who,

like Defendants, kept the Dossier's existence (and Defendants' authorship thereof)

secret for nearly two decades.    (A57, A64-65, A71-72, A76, ¶¶3, 37-41, 62, 76;

A288, A293, ¶¶11, 18; A405-15; DE 22-12.)    This case also arises from the

republication of Defendants' report about Mr. Chandler to the British media in 2017

(A71-72, A76-77, ¶¶62, 77)—a republication that, as described herein, was more

than reasonably foreseeable to Defendants at the time they published the Dossier to

Eringer (*see infra* Argument Part II).

Because this appeal presents, *inter alia*, the question of the foreseeability to

Defendants of Eringer's republication of the Dossier, it is necessary to begin with a

brief explanation of Defendants' background and Eringer's journalistic career and

reputation.

---

[2] Mr. Berlin's firm, which does business as "Investigative Consultants, Inc.,"
apparently comprises two corporate entities: Investigative Consultants, Inc. and
Investigative Consultants, Inc. of Washington DC.  (A61-62, ¶¶20-23; A263, ¶2.)
They are referred to collectively herein as "ICI."

### 1. Defendant Donald Berlin Founds Research and Intelligence-Gathering Firm ICI and Boasts Expertise in Developing Background Reports on People and Awareness of How His Clients Use Those Reports.

Defendant Donald Berlin has been in the research and investigative services industry for decades and is the President of Defendant ICI, which he founded in 1977. (A263, ¶2; A267, ¶11; A347.)  According to its website, ICI "is an organization of professional researchers, intelligence analysts and investigators trained to collect and analyze information on individuals and corporations" and "create customized data reports" on those targets. (A346-48.)  Defendants boast about the sophistication of their data and the breadth of their experience and expertise, stating that their customized target data reports draw on "over 9,000 information sources worldwide" and their "60 billion record file," and are prepared by personnel with over 30 years' experience and expertise in, among other areas, intelligence gathering, criminal investigations, psychology, and data interpretations. (*Id.*)

Defendants further tout—and demonstrate their knowledge of—the many ways their clients use their reports, including to perform corporate due diligence, undertake bank and risk compliance activities, and pursue complex litigation. (*Id.*) Indeed, Defendants expressly warn on ICI's website that they "do not serve the general public," and that "all searches done by ICI must be executed based upon a cognizable permissible purpose under ... State and Federal laws" (*id.*), which would

6

not include engaging Defendants to compile a background report on a person merely for one's private curiosity.

Notably, Defendants did not dispute before the district court that, in light of their experience, resources, and self-professed sophistication, they made themselves fully familiar with Robert Eringer's public profile at the time they contracted to produce a background report on Mr. Chandler for him, or, otherwise, they recklessly and purposefully avoided performing diligence on Eringer before doing so. (A267, ¶14 (never objected to or contested by Defendants); *see also* A64, ¶37.)

>          **2.      Non-Party Robert Eringer Separately Develops a Career as a Prolific Author, Tabloid Journalist, and Self-Styled Spymaster.**

Beginning in the late 1970s, Non-Party Robert Eringer—completely separately from and without any connection to Defendants—established himself as a tabloid journalist and prolific author of tales of espionage based, supposedly, on his own investigations.

Eringer launched his career as a freelance journalist in the late 1970s, and in 1980 published his breakthrough book *The Global Manipulators: The Bilderberg Group ... the Trilateral Commission ...Covert Power Groups of the West*, which he claims was the product of years "investigat[ing] [] the power elite." (A265, ¶¶1-2; A301.) After spending the 1980s working as a freelance journalist (A266, ¶3; *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1567 (D.C. Cir. 1984), *vacated on*

*other grounds*, 477 U.S. 242 (1986)), in 1992 Eringer published his first of what would become several books focused on the Principality of Monaco, *Monaco Cool* (A266, ¶6; A303), and followed that with multiple espionage-themed novels based on his purported investigations (A266, ¶8; A295-99]).

Despite Eringer's apparent professional successes, however, his public profile revealed, as early as 1984, a lack of reliability and apparent willingness to rumor-monger and spread salacious claims. Most notably, as memorialized in a published, publicly-available decision by this Court, Eringer was a key non-party to a libel suit in which this Court described him as an unreliable source of "scurrilous" allegations about the plaintiff in that case. *See Anderson*, 746 F.2d at 1577-79.

Nevertheless, by 2001, Eringer's reputation and public profile had grown to the point that he received national attention, and he was featured in a *Salon* Magazine article that, while regaling his apparent covert exploits, described him as "a fairly prolific author" "with uncommonly close ties to high-ranking former officials of the CIA" whose work focused "mostly on espionage-related subjects." (A408.)

Around this same time, Eringer moved to Monaco and ingratiated himself to Prince Albert II. (A64, ¶35; A308, ¶5.) In 2002, during a meeting with the Prince, Eringer told him that, for a fee, he could unmask traitors in Monaco and expose individuals engaged in money laundering, organized crime, and corrupt activities. (A64, ¶36; A308, ¶6]). According to Eringer, the Prince agreed. (*Id.*) Eringer

8

christened himself "Agent 001" and held himself out as a "Director" of the "Monaco Intelligence Service."  (A64, ¶36; A308-09, ¶7.)

> ### 3. Eringer Contracts at Arms'-Length with Defendants for a Background Report on Mr. Chandler, and Defendants Manufacture a False and Defamatory Dossier and Publish It to Eringer.

Having promised Prince Albert II his services rooting out crime and corruption in Monaco, Eringer purported to set about his task.  To that end, in late 2002, Eringer reached out to Defendants.  (A64, ¶38; A267, ¶14.)  Specifically, after inquiring whether Defendants could conduct background investigations into successful residents of Monaco, Eringer hired Defendants to produce a background investigation report on Mr. Chandler.  (A64, ¶38; A260, ¶1.)  Defendants then authored a detailed, 134-page report on Mr. Chandler, which they titled "INTRODUCTION AND OVERVIEW RICHARD CHANDLER LIMITED GLOBAL SCAN" (the "Dossier").[3]

The Dossier that Defendants authored, however, was a sensationalistic work of fiction.  (*See* A65-69, A73-75, A78-80, ¶¶42-53, 67, 82; A260; A271, ¶40; A284, ¶11; A349-82.)  Among other things, the Dossier accused Mr. Chandler (and his brother) of masterminding "a massive money-laundering scheme ... for high-level

---

[3] In the Dossier, Defendants published allegations about both Mr. Chandler and his brother, Richard Chandler.  The Dossier was often referred to as the "Pitch" or "Limited Report" in district court filings.

political types in Russia" (A349, A354), "hav[ing] links to a number of organized crime groups in Russia and elsewhere" (*id.*), working closely with at least one corrupt company where "[m]urder, extortion, blackmail and other [acts of] intrigue" are daily occurrences (A355), and even acting as Russian spies (A68, ¶50). Defendants knew these allegations were completely false and knowingly invented them based on news reports about other people.  (A66-68, A75-76, A80-81, ¶¶43-47, 68-69, 83-84; *compare* A349-55 (example false allegations in the Dossier), *with* A282, ¶¶2-3 (unrebutted declaration from Mr. Chandler explaining the falsity of the Dossier's allegations against him).)

Nevertheless, Defendants published the false, defamatory, and sensational Dossier to Eringer on February 24, 2003, and in so doing irreparably harmed Mr. Chandler's unblemished reputation as an ethical businessman and philanthropist who has worked tirelessly to fight global poverty and injustices.  (A65, ¶39; A263, ¶3.)  Defendants' motive was financial: after providing various salacious purported "facts" about Mr. Chandler, the Dossier quoted prices for additional, more in-depth investigative work targeting him.  (A366.)  Eringer, on the other hand, sought a Dossier on Mr. Chandler ostensibly to facilitate his work for Prince Albert II.  (A64, ¶38; A267, ¶14.)

Notably, Defendants have expressly denied that they published the Dossier to Eringer as part of any ongoing relationship with him aside from their contractual

duty to produce a background report on Mr. Chandler.  (A260, ¶¶1, 4; A264, ¶4.)  It is undisputed that Defendants "did no other work for Eringer or anyone else concerning [Mr. Chandler]."  (A260, ¶4; A264, ¶4; A277, ¶4.)

> ### 4.    Eringer Uses the Dossier to Publish His Own Works About Mr. Chandler, While He and Defendants Keep the Dossier Secret for Nearly Two Decades.

After receiving the defamatory Dossier from Defendants, Eringer used it to publish his own false allegations about Mr. Chandler—while Defendants and Eringer kept the Dossier (and Defendants' authorship thereof) secret for nearly two decades.

Eringer first used the Dossier to author a document titled "REPORT: THE CHANDLER BROTHERS" (the "Eringer Report") (A69, ¶54; A383-401), which repeats many false allegations about Mr. Chandler from the Dossier.  (A271-72, ¶¶44-46; A284-85, ¶¶12-13).  While the Eringer Report was not made public until 2017 (*see infra* Part A.5), Eringer, in 2014, published the book *The Spymaster of Monte Carlo*, which, in the course of touting Eringer's own supposed "Spymaster" bona fides, makes numerous false and defamatory allegations about Mr. Chandler (among others).  (A268, ¶¶18-19; DE 22-12 at 17-19, 52-54, 70, 144, 148, 184, 217).  And in 2016, Eringer posted a blog on his personal website titled *The Art of the Ruse: Richard and Christopher Chandler*, which repeated defamatory allegations about Mr. Chandler from *The Spymaster of Monte Carlo* (A255-58; A268, ¶¶20-21.)

11

Critically, at all times from Defendants' publication of the Dossier in 2003 until November 2017, Defendants and Eringer kept its existence a secret from everyone but themselves—and took steps to actively hide its existence. Not only does the record contain no evidence that the Dossier was shared or made known to anyone other than Defendants and Eringer until November 2017, but it contains substantial evidence that the Dossier was maintained in complete secrecy.

For their part, Defendants have represented that they long ago destroyed all documents related to the Dossier and their contract with Eringer to produce it. (A274, ¶63; A403, ¶2.) Moreover, Defendants stated in sworn interrogatory responses that they are *"unaware of __any source__"* that "was publicly available before September 14, 2017 that identified [Defendants] as the author of the [Dossier]" and that they are likewise *"unaware of __any source__"* that "was publicly available before September 14, 2017 that identified [Defendants] ... as having performed work regarding Chandler for Robert Eringer." (A467-68.)[4] And consistent with their representation that they long ago destroyed all documents relating to the Dossier and their work for Eringer, Defendants likewise stated that they possess no documents in which they are publicly identified as having authored the Dossier or performed

---

[4] Emphases added unless otherwise noted.

12

work for Eringer and no documents in which any third party stated or implied that they authored the Dossier or performed work for Eringer.  (A474-75.)

Eringer, for his part, actively hid the existence of the Dossier and publicly represented that he himself had performed the research on Mr. Chandler with which he was associated.  For example, in a 2009 lawsuit in which Eringer sued Prince Albert II for supposed non-payment for his intelligence-gathering services, Eringer publicly filed a Verified Complaint in which he stated, under penalty of perjury, that *he*—not another person—"intensively investigated" Mr. Chandler in 2002-2003.  (A288, ¶8; A310, ¶13 ("***Eringer intensively investigated*** Sovereign Group ... and its principals Richard and Christopher Chandler[.]").)  Moreover, Eringer made no mention whatsoever of Defendants in that complaint.  (*See id.*)  In short, Eringer publicly took full credit for investigative efforts with regard to Mr. Chandler.  (*See id.*)

Similarly, Eringer's 2014 book, *The Spymaster of Monte Carlo*, contained no mention of Defendants, the Dossier they published to Eringer, or the fact that Eringer contracted with Defendants to obtain information about Mr. Chandler.  (A268, ¶¶18-19; DE 22-12.)  And Eringer's 2016 blog, *The Art of the Ruse: Richard and Christopher Chandler*, likewise contained no mention of Defendants, the Dossier they published to Eringer, or the fact that Eringer contracted with Defendants to

13

obtain information about Mr. Chandler.  (A255-58; A268, ¶¶20-21.)  Again, with regard to investigation of Mr. Chandler, Eringer claimed full credit.

> **5.** **Eringer Republishes the Dossier to the British Media, and Mr. Chandler, Through Extraordinary and Above-and-Beyond Investigatory Efforts, Discovers Its Existence and Authorship by Defendants.**

In November 2017, after keeping the Dossier secret for nearly two decades, Eringer provided part of it, along with the Eringer Report, to *The Sunday Times*—which Mr. Chandler did not learn until May 2018 following months of extraordinary investigative efforts.

Mr. Chandler's investigation that ultimately led him to discover the Dossier (and Defendants' authorship thereof) was prompted on November 30, 2017, when his representative received an email from a reporter with the *Times* claiming that the reporter had seen "Monaco police files" stating that Mr. Chandler was suspected of money laundering and working for Russian intelligence.  (A268-69, ¶¶22-24; A283, ¶4.)  Initially, the reporter offered to share the files with Mr. Chandler, but then reversed course after receiving a prompt response and request to see them.  (A269, ¶25; A283, ¶4.)  Instead, on December 1, 2017, the reporter provided Mr. Chandler's representative only brief statements that he claimed were pulled from the documents—without further description of the documents.  (A269, ¶26; A283, ¶5.)  Then, on December 3, 2018, the *Times* published an article stating that "an 87-page dossier—which includes what appear to be copies of Monaco police files—is being

circulated about Chandler ... with allegations over links to Russia." (A269, ¶27; A283, ¶6.)

Following publication of the *Times*' article, Mr. Chandler inquired with various news organizations in an effort to identify the "87-page dossier" that was the source of the article's allegations. (A270, ¶32; A283-84, ¶9.) Despite his efforts, no one would provide him a copy of it. (A270, ¶33; A283-84, ¶9.)

On May 1, 2018, British MP Bob Seely stated during a Parliamentary debate that he had seen "brief, terse, factual files" accusing Mr. Chandler of money laundering and Russian espionage. (A269, ¶28; A283, ¶7.) Mr. Chandler then inquired with Members of Parliament and repeatedly wrote to Seely asking to discuss and view the source of those accusations. (A269, ¶29; A284, ¶7.) But Seely ignored his entreaties. (A269-70, ¶30; A283, ¶7.)

On May 10, 2018, in an effort to set the record straight about the false criminal accusations against him, Mr. Chandler met with the *Times* for an interview. (A270, ¶34; A284, ¶10.) During that meeting, the *Times* allowed him to review the "87-page dossier" that it had referenced in its article. (A270, ¶35; A284, ¶10.) That document in fact contained two documents: (1) the Eringer Report (*see supra* Part A.4), and (2) the first 34 pages of Defendants' Dossier, which indicated that the full Dossier was 134 pages. (A270-71, ¶¶36-40; A284, ¶¶10-11.) Before that time,

15

Mr. Chandler had never seen either the Eringer Report or the Dossier.  (A270 ¶35; A284, ¶10.)

Because the Dossier was redacted to hide its author, Mr. Chandler retained research analysts to investigate its authorship.  (A272, ¶46; A285, ¶13.)  That investigation identified "ICI," which was referenced in the Dossier (and missed by the person who redacted it), as Investigative Consultants, Inc., but found over 300 registered U.S. entities with that name or a variation thereof.  (A272, ¶¶46-48; A285, ¶13.)  Ultimately, Mr. Chandler's investigation identified Defendant ICI and then identified Defendant Berlin as ICI's President.  (*Id.*)  In doing so, Mr. Chandler succeeded in doing what no news organization that reported allegations from the Dossier had done: identify Defendants Berlin and ICI as the authors and original publishers of the Dossier.

Before seeing the Dossier and conducting his detailed investigation, Mr. Chandler had never heard of Defendants.  (A272, ¶49; A284-85, ¶¶12-13.)

### 6.    Mr. Chandler Demands That Defendants Retract the False and Defamatory Dossier, But Defendants Refuse to Do So.

After learning of the Dossier and Defendants' authorship thereof—and before filing this lawsuit—Mr. Chandler's counsel sent Defendants a letter demanding that they retract the Dossier.  (A16-48; A273, ¶53; A288, ¶13.)

Mr. Chandler's retraction demand explained that his research had identified Defendants as the Dossier's author, that the Dossier's allegations about him are false,

and that he is now aware that Defendants published the Dossier to Eringer in 2003.
(*Id.*)  The retraction demand further stated that unless Defendants mitigated the
severe harm that the defamatory Dossier caused Mr. Chandler—including by signing
a letter and affidavit disclaiming the Dossier's allegations—Mr. Chandler would file
this lawsuit.  (*Id.*)  The demand attached a copy of Mr. Chandler's proposed
complaint to allow Defendants a pre-suit opportunity to dispute any of its
allegations.  (*Id.*)  The retraction demand further noted that Mr. Chandler would take
all appropriate steps to mitigate the harm caused by the Dossier.  (*Id.*)

By return letter, Defendants admitted responsibility for authoring the Dossier
and publishing it to Eringer, and, remarkably, claimed that they have no knowledge
whether their allegations about Mr. Chandler are true or false.  (A50-55; A274-75,
¶¶60-65; A403, ¶6.)  Defendants, however, refused to retract the Dossier.  (*Id.*)  This
lawsuit followed.

### B.    Course of Proceedings Below

Mr. Chandler filed his complaint on September 14, 2018, asserting two
defamation claims against Defendants based on (1) Defendants' publication of the
Dossier to Eringer in 2003 and (2) Eringer's republication of the first 34 pages of
the Dossier to the British media in 2017.  (SA1-29.)  After the district court granted
in part Defendants' motion to strike portions of the complaint (DE 4; A9-12),

Mr. Chandler filed a redacted version of his complaint on October 22, 2018.  (A55-82.)

Defendants then moved to dismiss under Rule 12(b)(6) or, alternatively, for summary judgment.  (A247-49.)  Defendants only argued that dismissal was warranted on two grounds: (1) the statute of limitations had expired—and was not sufficiently tolled—with regard to Defendants' 2003 publication of the Dossier to Eringer because Mr. Chandler should have known about that publication based on Eringer's 2009 lawsuit against the Prince of Monaco, his 2014 publication of *The Spymaster of Monte Carlo*, and/or his 2016 blog post excerpting that book; and (2) it was not reasonably foreseeable that Eringer would republish the Dossier.  (*Id.*)

The district court granted in part and denied in part Defendants' motion. (A416-26.)  The court granted Defendants summary judgment with regard to Eringer's 2017 republication of the first 34 pages of the Dossier to the media. (A421-24.)  In explaining its ruling, the court focused on whether, when Defendants published the Dossier to Eringer, it was reasonably foreseeable to them that Eringer would republish it *in 2017*, rather than whether it was reasonably foreseeable that Eringer would republish it at all.  (A422 ("[N]o reasonable juror could find that Defendants in 2003 could have reasonably foreseen Eringer's republication *in 2017*."); *id.* ("It would take extraordinary facts to find that a republication occurring fourteen years after the original publication was reasonably foreseeable.").)  The

18

court did not consider in its opinion, among other things, the facts that Eringer was a known tabloid journalist and prolific author or the sensational nature of the allegations in the Dossier. (*See* A57, A64-65, A71-72, A76, ¶¶3, 37-41, 62, 76; A416-26; A408; DE 22-12; *Anderson*, 746 F.2d at 1567.)

The district court denied Defendants' motion with respect to their 2003 publication of the Dossier to Eringer, holding that it "could not conclude, as a matter of law," that through the exercise of "reasonable diligence under all of the circumstances," Mr. Chandler could have discovered Defendants' creation of the Dossier more than a year prior to filing the lawsuit. (A425.) The Court ordered only limited discovery "as to whether Plaintiff's claim with respect to the original publication of the [Dossier] in 2003 is time barred." (*Id.*)

Following very limited discovery, Defendants renewed their motion for summary judgment. (A437-38.) Although Defendants agreed that the District of Columbia's discovery rule applied to Mr. Chandler's claim (A485; DE 32-2 at 8), they argued that Mr. Chandler should have known about his defamation claims against Defendants more than a year before he sued them because Eringer published his own defamatory allegations about Mr. Chandler in his 2009 lawsuit, 2014 book, and 2016 blog post, and "by failing to sue Eringer within the limitations period, Plaintiff failed to learn what he would have learned in such a lawsuit, *i.e.*, that Defendants had given Eringer the [Dossier] in 2003" (DE 32-2 at 11).

The district court granted Defendants summary judgment with respect to their 2003 publication of the Dossier.  The court entered its final order and judgment on January 30, 2020.  (A497.)  This appeal follows.

## SUMMARY OF ARGUMENT

The district court reversibly erred in granting Defendants' motion for summary judgment and renewed motion for summary judgment.

*First*, the district court erred in granting Defendants' motion for summary judgment and holding, as a matter of law, that Eringer's 2017 republication of Defendants' defamatory Dossier was unforeseeable to Defendants.  (A424.)  Under District of Columbia law, "[t]he original publisher of a defamatory statement may be liable for republication if the republication is reasonably foreseeable." *Oparaugo v. Watts*, 884 A.2d 63, 73 (D.C. 2005).  Reasonable foreseeability is an objective standard, presents "a question of fact," and "is measured as of the time of the defendant's wrongdoing." *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 471 (3d Cir. 2011), *as amended* (Oct. 7, 2011); *Crabbs v. Scott*, 800 F. App'x 332, 338 (6th Cir. 2020); *Paavola v. United States*, --- F. Supp. 3d ----, 2020 WL 2064789, at *11 (D.D.C. Apr. 29, 2020).

Here, the record contains evidence of facts of the precise types that courts hold make republication of a libel reasonably foreseeable, including evidence that Defendants published their defamatory Dossier to a known freelance journalist,

20

tabloid reporter, and "prolific author," *e.g.*, *Tavoulareas v. Piro*, 759 F.2d 90, 136 n.56 (D.C. Cir. 1985), *vacated in part on other grounds on reh'g*, 763 F.2d 1472 (D.C. Cir. 1985), *and aff'd on reh'g*, 817 F.2d 762 (D.C. Cir. 1987), evidence that the Dossier contained sensational and salacious allegations of the type that people have a "known tendency" to repeat, *e.g.*, Restatement (Second) Torts § 576 cmt. d, and evidence that Defendants know their clients often share the information they provide them and specifically knew that Eringer requested the Dossier to use the information therein (A263, ¶2; A267, ¶11; A346-48).  The district court, however, ignored or discredited that evidence—which, at minimum, raised a factual dispute regarding the foreseeability "question of fact"—and granted Defendants' summary judgment by first misconstruing the question of the foreseeability of republication as a question of the foreseeability of republication ***on a future date certain***, and by then relying on evidence that courts have recognized is insufficient to render republication unforeseeable as a matter of law.

***Second***, the district court erred in granting Defendants' renewed motion for summary judgment and holding that Mr. Chandler's defamation claim based on Defendants' secret publication of the Dossier to Eringer in 2003 was time-barred. Although the court correctly recognized that the District of Columbia's discovery rule tolled the statute of limitations on Mr. Chandler's claim, it erred in its application of that rule by holding that Mr. Chandler's knowledge that he could

potentially have sued Eringer based on statements Eringer made in his 2009 lawsuit, 2014 book, or 2016 blog post—i.e., Mr. Chandler's knowledge that he could have brought *different* claims against a *different* person based on *different* publications at *different* times to a *different* audience causing him *different* harm—accrued his claims against Defendants more than a year before he brought this case. In addition, the court erroneously held that Mr. Chandler, through the exercise of due diligence— which the court held required him to sue Eringer to attempt to procure court-ordered discovery that might identify Defendants, despite "settled [law] that reasonable diligence does *not* require a person to commence a lawsuit in order to procure court-ordered discovery of concealed facts," *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986)—could and would have discovered his claim against Defendants more than a year before he filed this case such that, even under the discovery rule, his claim is time-barred.

## STANDARD OF REVIEW

This Court "review[s] the District Court's grant of summary judgment *de novo*, considering the record taken as a whole, viewing the evidence in the light most favorable to [the non-movant], and drawing all reasonable inferences in [the non-movant's] favor." *Stoe v. Barr*, --- F.3d ----, 2020 WL 2781649, at *1 (D.C. Cir. May 29, 2020) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 15, (2000); *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019)).

"Summary judgment is proper only if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005) (quoting Fed. R. Civ. P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

This Court "review[s] the application of the statute of limitations *de novo*." *Seed Co. v. Westerman*, 832 F.3d 325, 331 (D.C. Cir. 2016). "The burden of proof rests with the defendants because the statute of limitations is an affirmative defense." *Id.* (citing *Brin v. S.E.W. Inv'rs*, 902 A.2d 784, 800-01 (D.C. 2006)).

## **ARGUMENT**

## I.     **The District Court Reversibly Erred In Holding As A Matter of Law That It Was Not Reasonably Foreseeable To Defendants That A Tabloid Journalist And Prolific Author Would Republish Defendants' Defamatory Dossier.**

The district court reversibly erred in granting Defendants' motion for summary judgment and holding, as a matter of law, that Eringer's 2017 republication of their defamatory Dossier was unforeseeable to them. (A424.)

Under District of Columbia law, "[t]he original publisher of a defamatory statement may be liable for republication if the republication is reasonably foreseeable." *Oparaugo v. Watts*, 884 A.2d 63, 73 (D.C. 2005); *accord Tavoulareas*

23

*v. Piro*, 759 F.2d 90, 136 n.56 (D.C. Cir. 1985) ("The maker of a slanderous statement may be held accountable for its republication if such republication was reasonably foreseeable."), *vacated in part on other grounds on reh'g*, 763 F.2d 1472 (D.C. Cir. 1985), *and aff'd on reh'g*, 817 F.2d 762 (D.C. Cir. 1987). The "reasonably foreseeable" standard is objective, *see Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 471 (3d Cir. 2011), *as amended* (Oct. 7, 2011); *Weddington v. United Nat'l Ins. Co.*, 346 F. App'x 224, 226 (9th Cir. 2009), and "[f]oreseeability is measured as of the time of the defendant's wrongdoing," *Crabbs v. Scott*, 800 F. App'x 332, 338 (6th Cir. 2020). Notably, like the question of republication itself, the question of foreseeability is "a question of fact" that is "nearly always" reserved "for the jury." *Paavola v. United States*, --- F. Supp. 3d ----, 2020 WL 2064789, at *11 (D.D.C. Apr. 29, 2020) (quoting *District of Columbia v. Carlson*, 793 A.2d 1285, 1291 (D.C. 2002) (ellipsis in *Paavola*)); *Smith v. Hope Vill., Inc.*, 481 F. Supp. 2d 172, 193 (D.D.C. 2007).[5]

Accordingly, the district court's award of summary judgment to Defendants with regard to Eringer's 2017 republication of their defamatory Dossier can only be

---

[5] *See also, e.g.*, *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 879 (W.D. Va. 2016) ("[T]he question of whether plaintiff has proved the element of publication is a factual one for the jury. It follows, then, that republication is also for the factfinder to determine."); *Tavoulareas*, 759 F.2d at 136 ("Responsibility for publication is a factual question which is normally for the jury to resolve.").

proper if there are no genuine disputes of material fact and, viewing the record evidence in the light most favorable to Mr. Chandler, *no* reasonable juror could find Eringer's republication of the Dossier reasonably foreseeable to Defendants when they published it to him.  By contrast, summary judgment was improper—and the district court reversibly erred—if there is *any* evidence in the record (viewed most favorably to Mr. Chandler) from which a reasonable juror could find that it was reasonably foreseeable to Defendants when they published the Dossier to Eringer that he would republish it.

### A.    The District Court Failed to Credit Evidence That Made It Reasonably Foreseeable to Defendants That Eringer Would Republish Their Defamatory Dossier.

The district court, in holding as a matter of law that it was unforeseeable to Defendants that Eringer would republish their Dossier, failed to credit key evidence of the types that courts have repeatedly held render republication of a libel reasonably foreseeable.

*First*, this Circuit and courts across the country have repeatedly recognized that when a person publishes a defamatory statement to a journalist, "it [is] reasonably foreseeable that as reporters they might republish the statements." *Tavoulareas*, 759 F.2d at 136 n.56; *see also, e.g.*, *Wright v. Bachmurski*, 29 P.3d 979, 985 (Kan. Ct. App. 2001) (reversing summary judgment and holding defendants who made defamatory statements to a journalist liable for their

republication because Defendants "could have reasonably expected" the journalist to republish them); *Wiggins v. Creary*, 475 So. 2d 780, 782 (La. Ct. App.), *writ denied*, 478 So. 2d 910 (La. 1985) (same; "[i]t is clear that republication ... was a natural and probable consequence of [defendant's] statements to the reporter"); *see also Unsworth v. Musk*, No. 18-cv-8048, 2019 WL 8220721, at *11 (C.D. Cal. Nov. 18, 2019) (holding that, despite defendant's claims that "he could not reasonably foresee republication of his statements" by the journalist to whom he made them "because of his previous experience with reporters and the fact that he wrote 'off the record' at the beginning of [his] Email [to the reporter]," genuine issues of material fact precluded summary judgment that "republication was not reasonably foreseeable as a matter of law").[6]  Indeed, even the caselaw cited by the district court has specifically distinguished the facts at issue in those cases from ***"[t]he obvious example" of foreseeability*** "when a person makes a defamatory statement to a [] reporter who, in turn, repeats it in a[n] [] article." *See Geraci v. Probst*, 15 N.Y.3d

---

[6] This makes sense, as "the most basic functions performed by all reporters" include "research[ing] and min[ing] sources and follow[ing] story tips and writ[ing] stories." *Galligan v. Detroit Free Press*, --- F. Supp. 3d ----, 2020 WL 475341, at *10 (E.D. Mich. Jan. 29, 2020) (quotation marks omitted); *see also Schneider v. United Airlines, Inc.*, 208 Cal. App. 3d 71, 74 (Cal. Ct. App. 1989) (holding it reasonably foreseeable that credit reporting agency would republish defamatory statements about a person's credit because republishing credit information "is the function of a credit reporting agency").

336, 343-44 (N.Y. 2010); *Bryan v. News Corp.*, No. B275567, 2018 WL 720057, at *12 (Cal Ct. App. Feb. 6, 2018) (same).

Here, record evidence—especially when viewed in the light most favorable to Mr. Chandler, as it must be—demonstrates that by 2002 Robert Eringer was an established tabloid reporter, "freelance journalist," "prolific author," and had published numerous articles and stories of espionage based on purported investigative research.  By 2002, Eringer:

- Had published numerous books, including many focused on Monaco, espionage, and "investigations" (A265-66, ¶¶3, 6, 8; A296-99; A301; A303);

- Worked as a "freelance journalist" (A266, ¶3; *Anderson*, 746 F.2d at 1567);

- Had, on at least one occasion, been publicly identified as an unreliable source of "scurrilous" allegations (A266, ¶5; *Anderson*, 746 F.2d at 1577-79); and

- Been nationally featured as "a fairly prolific author" by *Salon* Magazine (A408).

Moreover, record evidence demonstrates that Defendants have decades of experience in the investigative services industry and have long touted the sophistication of their data and the breadth of their experience and expertise (A263, ¶2; A267, ¶11; A346-48), which makes it reasonable to infer that they made themselves fully familiar with Eringer's public profile when they contracted to produce the Dossier for him—or, otherwise, Defendants recklessly and purposefully avoided doing so.  Indeed, Mr. Chandler included exactly that fact in his Counter Statement of Material Facts in Opposition to Defendants' Motion for Summary

27

Judgment, and Defendants neither objected nor responded at all to contest it. (A267, ¶14.) This record evidence supports the conclusion that it was reasonably foreseeable to Defendants that Eringer would republish the Dossier.

*Second*, courts have repeatedly recognized that sensational or salacious accusations are likely to be republished, thereby making republication reasonably foreseeable. *See, e.g.*, *Murphy v. Boston Herald, Inc.*, 865 N.E.2d 746, 764 (Mass. 2007) (holding that defendants could "reasonably have foreseen" that journalists would repeat sensational libel accusing judge of stating "She's [fourteen]. She got raped. Tell her to get over it."); *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1096 (S.D.N.Y. 1984) (holding that the authors of story that "provoked a famous political scandal" "must reasonably have foreseen its republication" by others); *Moore v. Allied Chem. Corp.*, 480 F. Supp. 364, 376 (E.D. Va. 1979) (fact that defamatory statement related to "newsworthy items of national interest" constitutes evidence that republication was reasonably foreseeable); *Tumbarella v. Kroger Co.*, 271 N.W.2d 284, 290 (Mich. Ct. App. 1978) (reversing judgment for defendants and holding fact that defendants' defamatory publication "contained [the] highly inflammatory communication that plaintiff had been caught stealing," "should have [made defendants] expect[] republication"). This makes sense because, as explained in Restatement (Second) of Torts § 576—which has been applied by the D.C. Court

of Appeals[7]—there is a "known tendency of human beings to repeat discreditable statements."  Restatement (Second) Torts § 576 cmt. d.

Here, record evidence shows that Defendants' defamatory statements about Mr. Chandler were sensational and salacious.  Defendants' Dossier accused Mr. Chandler of masterminding "a massive money-laundering scheme ... for high-level political types in Russia (A349, A354), "hav[ing] links to a number of organized crime groups in Russia and elsewhere" (*id.*), working closely with at least one corrupt company where "[m]urder, extortion, blackmail and other [acts of] intrigue" are daily occurrences (A355), and even acting as a Russian spy (A68, ¶50)—criminal activities orders of magnitude more serious than accusations of shoplifting or making repulsive comments.  *See Murphy*, 865 N.E.2d at 764; *Tumbarella*, 271 N.W.2d at 290.  And allegations of espionage and organized crime are likewise matters of national interest, thus further demonstrating the reasonable foreseeability of their republication.  *See Moore*, 480 F. Supp. at 376.[8]

Moreover, and further suggesting—if not outright demonstrating—the likelihood of those sensational accusations to garner public interest, Eringer featured them in a book published to a worldwide audience.  (*See* A268, ¶¶18-19; DE 22-12

---

[7] *See Ingber v. Ross*, 479 A.2d 1256, 1269 (D.C. 1984).

[8] Record evidence suggests that Eringer even reported the substance of Defendants' allegations (in the Eringer Report) to Prince Albert II.  (*See* A384-401; A288-89, ¶¶13, 14.)

at 17-19, 52-54, 70, 144, 148, 184, 217.)  Similarly, as Eringer touted what he claimed was his own work showing that Mr. Chandler engaged in "unlawful business in Monaco," record evidence suggests that Defendants' defamatory accusations captured the attention of Prince Albert II.  (A384-401; A288-89, ¶¶13, 14.)  This, too, is competent record evidence suggesting that it was reasonably foreseeable to Defendants that Eringer would republish their defamatory Dossier.

***Finally***, the district court failed to credit the record evidence that Defendants—who have decades of experience in the research and investigation industry (A263, ¶2; A267, ¶11; A347)—have actual knowledge that information in background reports they produce are often shared by their clients such that it was reasonably foreseeable to them that Eringer would republish the Dossier about Mr. Chandler that they published to him.  As detailed above, Defendants boast about—and thereby demonstrate their knowledge of—the many ways their clients use their reports.  (A346-48.)  Defendants brag that, among other things, their clients use information from them to perform corporate due diligence, undertake bank and risk compliance activities, and pursue complex litigation.  (*Id.*)  Moreover, Defendants explain that "all searches done by ICI must be executed based upon a cognizable permissible purpose under ... State and Federal laws" (*id.*), which would not include engaging Defendants to compile a background report on a person merely for one's private curiosity.  Simply put, Defendants know that their clients engage

their services to obtain information so they can *use* it, which may involve sharing it with third parties—i.e., republishing that information.  This is yet further competent record evidence suggesting that it was reasonably foreseeable to Defendants that Eringer would republish the Dossier.  *See, e.g.*, *Bolduc v. Bailey*, 586 F. Supp. 896, 898, 901 (D. Colo. 1984) (holding it reasonably foreseeable to defendant-private-investigator that his defamatory accusations that a person committed crimes, engaged in immoral conduct, and was a traitor would be republished); *Liverpool v. Con-Way, Inc.*, No. 08-cv-4076, 2009 WL 1362965, at *10 (E.D.N.Y. May 15, 2009) (holding republication of defamatory statement reasonably foreseeable to defendants based on their "familiarity with" how information is used in their industry).

Moreover, Defendants' own statements demonstrate that they knew Eringer would republish their Dossier to third parties.  Defendants have stated that they told Eringer he should not rely on the Dossier's allegations against Mr. Chandler unless and until they were "confirmed by secondary sources" other than Defendants because Defendants have "no personal knowledge" about Mr. Chandler.  (A403, ¶¶5-6.)  Thus, at the time they published the Dossier to Eringer, Defendants not only foresaw that he would republish its defamatory accusations, they in fact instructed him to do so, putatively to verify the accusations.  This is further evidence suggesting that it was reasonably foreseeable to Defendants that Eringer would republish the

Dossier. And because the "reasonable foreseeability" standard is objective, *Animal Sci. Prod.*, 654 F.3d at 471; *Weddington*, 346 F. App'x at 226, this evidence is not undermined by Defendant Berlin's self-serving affidavit protesting that he subjectively did not foresee republication of the Dossier.

**B.    The District Court's Reasons for Holding That as a Matter of Law It Was Unforeseeable to Defendants That Eringer Would Republish the Dossier Do Not Support That Holding.**

The district court reversibly erred in holding that it was unforeseeable—as a matter of law—to Defendants that Eringer would republish their Dossier for the separate and independent reason that the facts and authorities it cited as justifying that holding do not do so.

Most fundamentally, the district court's opinion confirms that it misunderstood the nature of the foreseeability question it addressed. When deciding whether republication of a libel was reasonably foreseeable, the relevant question is whether "such republication was reasonably foreseeable," *Tavoulareas*, 759 F.2d at 136 n.56, ***not*** whether republication on a specific future date was reasonably foreseeable, *see Shepard v. Nabb*, 581 A.2d 839, 846 (Md. Ct. Spec. App. 1990) (holding that where plaintiff "aver[red] that [defendant's defamatory] remarks ... were made with the intent that they be published in [a newspaper] on May 31, ... a jury could [] find that the republication of those remarks in later issues of that newspaper or another [newspaper] was a natural and probable consequence of

[making] the initial remarks").[9]  Indeed, no caselaw—and certainly no caselaw cited by the district court—holds that for a republication to be have been reasonably foreseeable to a defendant it must have been reasonably foreseeable to him that his libel would be republished on a specific future date certain.   Because "[f]oreseeability is measured as of the time of the defendant's wrongdoing" and not in "hindsight," *Crabbs*, 800 F. App'x at 338, such a rule would make demonstrating the reasonable foreseeability of republication virtually impossible: rare would be the plaintiff who could demonstrate—or even have a basis to allege—that it was reasonably foreseeable to a defendant when he published his libel that it would be repeated on a specific future date.  Simply put, that is not the law.  *See Shepard*, 581 A.2d at 846.

Nevertheless, the district court's opinion makes clear that its holding that republication was unforeseeable as a matter of law to Defendants turned on its belief that "no reasonable juror could find that Defendants in 2003 could have reasonably foreseen Eringer's republication ***in 2017***."  (A422; *see also id.* ("It would take extraordinary facts to find that a republication occurring fourteen years after the

---

[9] "The common law of Maryland is 'the source of the District's common law and an especially persuasive authority when the District's common law is silent[.]" *Saylab v. Don Juan Rest., Inc.*, 332 F. Supp. 2d 134, 142-43 (D.D.C. 2004) (quoting *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983)); *see also* D.C. Code § 45-401.

original publication was reasonably foreseeable.").)   The district court erred in so holding.

Moreover, even if the district court did not err in that analysis, none of its four stated reasons for holding as a matter of law that it was unforeseeable to Defendants that Eringer would republish their Dossier can sustain that holding.

*First*, the district court held that the "most important[]" reason republication by Eringer was not reasonably foreseeable to Defendants was because "fourteen years elapsed between Defendants' initial publication and Eringer's republication." (A422.)   But "[f]oreseeability is measured as of the time of the defendant's wrongdoing," not in "hindsight," *Crabbs*, 800 F. App'x at 338, and the passage of time *after* Defendants published their defamatory Dossier to Eringer cannot possibly affect the foreseeability of republication to Defendants "*at the time* of [their] wrongdoing"—i.e., at the time they published the Dossier to Eringer.   Future events cannot make foreseeability at an earlier date more or less likely.   That is pure hindsight.   Rather, if republication is reasonably foreseeable at the time Defendants published their Dossier to Eringer (and it was, as detailed above), it remains foreseeable at that time despite the subsequent passage of time.   *E.g.*, *Green v. Cosby*, 138 F. Supp. 3d 114, 122-23, 127 (D. Mass. 2015) (holding republication in

2014 of defamatory statement originally made nine years earlier in 2005 reasonably foreseeable).  None of the cases cited by the district court hold otherwise.[10]

**Second**, the district court quoted the observation in Restatement (Second) of Torts § 576 cmt. d that "if the originator has himself widely disseminated the defamation ... the fact may be taken into account in determining whether there were grounds to expect [] further dissemination," and, based thereon, concluded that because "Defendants did not widely disseminate the [Dossier] in 2003," but rather only "sent the [Dossier] to Eringer," "nothing about the manner of publication in 2003 ... provides grounds to reasonably expect republication by Eringer fourteen years later." (A423.)  But whether a defamatory publication is widely disseminated is just one of many facts that bears on whether republication is reasonably foreseeable; that alone is not determinative.  Indeed, the very Restatement comment partially quoted by the district court also explains that "[i]n determining [the

---

[10] *See Geraci*, 15 N.Y.3d at 343-44 (distinguishing facts of case from "the obvious example" of foreseeability "when a person makes a defamatory statement to a [] reporter who, in turn, repeats it in a[n] [] article"); *Bryan*, 2018 WL 720057, at *12 (same); *HV Assocs. LLC v. PNC Bank, N.A.*, No. 17-cv-8128, 2018 WL 1731346, at *6 (D.N.J. Apr. 10, 2018) (plaintiffs' conceded that defendant's alleged defamatory statement in 2012 had "no logical relation" to its alleged defamatory statement in 2017, thus the latter cannot be a republication of the former); *Founding Church of Scientology of Wash., D.C. v. Am. Med. Ass'n*, 377 N.E.2d 158, 161 (Ill. App. Ct. 1978) (no republication at issue; defamatory article "was published generally and released in 1968"; three copies from same production run released in 1975 "were nothing more than miscellaneous copies incidental to the general publication of the article 7 years earlier").

foreseeability of republication], the known tendency of human beings to repeat discreditable statements ... is [also] a factor to be considered." Restatement (Second) Torts § 576 cmt. d. And, as explained above, Defendants' sensational accusations of Russian espionage, money-laundering, and organized crime involvement are precisely the type of "discreditable statements" that it is foreseeable would be repeated. (*See supra* Part I.A.)

*Third*, the district court held that because the Dossier bore the words "Confidential Memorandum to File," it "on its face expressed reasonable assurance that it would go no further." (A423 (quotation marks and alterations omitted).) But again, that is just one fact to consider; it is not determinative. Indeed, caselaw from around the country holds that confidentiality designations and express instructions not to republish defamatory statements are insufficient to justify finding republication of defamatory statements not reasonably foreseeable as a matter of law. *See, e.g.*, *Unsworth*, 2019 WL 8220721, at *11 (holding neither defendant's written disclaimer that defamatory statement was "off the record" nor his prior experience with journalists maintaining confidences sufficient to grant summary judgment that "republication was not reasonably foreseeable as a matter of law"); *Tennenbaum v. Ariz. City Sanitary Dist.*, No. 10-cv-2137, 2013 WL 2422684, at *12 (D. Ariz. June 3, 2013) (denying defendant summary judgment that republication was not reasonably foreseeable even though "[defendant] specifically instructed

36

[third party] not to provide [his allegedly defamatory] letter to [others]"); *Yarus v. Walgreen Co.*, No. 14-cv-1656, 2015 WL 1021282, at *4 n.1 (E.D. Pa. Mar. 6, 2015) (refusing to dismiss defamation claim based on republication of even legally *privileged* information where "Plaintiff has pled that it was reasonable and probable that Defendants' employees ... would repeat to third parties ... the content of the [publication]").  The sole case that the district court cited to support is holding otherwise[11] presents a factual situation entirely distinguishable from that here—a legally-privileged document and a binding confidentiality agreement between the defendant and the third-party republisher.

    ***Finally***, the district court held that "[i]t was not reasonably foreseeable ... that Eringer would have reason to republish the information [in the Dossier] fourteen years after he received it" because "Defendants did not have any indication in 2003 that the information contained in the [Dossier] would become newsworthy nearly a decade-and-a-half later" because of Brexit.  (A423-24.)  But, again, the district court misapprehended the nature of the foreseeability inquiry: the relevant question is simply whether, at the time Defendants published the Dossier to Eringer, it was reasonably foreseeable to them that he would republish it in the future, not on a specific date.  And the district court's holding likewise fails to consider the fact that

---

[11] *See Meyers v. Levinson*, No. 02-cv-9, 2005 U.S. Dist. LEXIS 42799, at *78 (E.D. Va. July 26, 2005).

the Dossier's accusations that Mr. Chandler was engaged in "a massive money-laundering scheme," organized criminal activities, and Russian espionage would themselves be "newsworthy" so as to make their republication reasonably foreseeable. *See, e.g.*, *Bement v. N.Y.P. Holdings, Inc.*, 307 A.D.2d 86, 90 (N.Y. App. Div. 2003) (recognizing that an article reporting allegations of espionage "clearly reports newsworthy events" that are "for better or worse, undoubtedly a matter of public interest"). The fact that those allegations may have become *more* newsworthy after their original publication does not change that conclusion or render their republication unforeseeable.

***

In sum, the district court reversibly erred in holding as a matter of law that it was unforeseeable to Defendants that Eringer would republish their Dossier, and the district court's grant of summary judgment with regard to Eringer's 2017 republication of the first 34 pages of the Dossier should be reversed.

## II. The District Court Reversibly Erred In Holding As A Matter of Law That Mr. Chandler's Defamation Claim Based On Defendants' Secret 2003 Publication Of The Dossier To Eringer Is Time-Barred Despite Application Of The Discovery Rule.

The district court likewise erred in granting Defendants' renewed motion for summary judgment and holding that Mr. Chandler's defamation claim based on Defendants' secret publication of the Dossier to Eringer in 2003 was time-barred. Although the court correctly recognized that the District of Columbia's discovery

38

rule applied to toll the statute of limitations on Mr. Chandler's claim, it erred in its application of that rule.

Under District of Columbia law, although defamation claims are subject to a one-year statute of limitations, D.C. Code § 12-301(4), the District's discovery rule determines when a cause of action for defamation accrues for limitations purposes— as the district court correctly recognized and Defendants acknowledged below. (A485; DE 32-2 at 8); *McFadden v. Wash. Metro. Area Transit Auth.*, 204 F. Supp. 3d 134, 152 (D.D.C. 2016) ("[T]he discovery rule may be applied to defamation claims other than those of the mass media context."); *Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 172 (D.D.C. 2014) (similar).[12]  Under the District's discovery rule,

> a cause of action accrues for purposes of the statute of limitations when the plaintiff has either actual notice of her cause of action or is deemed to be on inquiry notice because if she had met her duty to act ***reasonably under the circumstances*** in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice.

*Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996).  Stated another way:

> Once the plaintiff actually knows, or with the exercise of ***reasonable*** diligence would have known, of some injury, ***its cause-in-fact***, and some evidence of wrongdoing, then she is bound to file her cause of

---

[12] *See also, e.g.*, *Ayres v. Ocwen Loan Serv., LLC*, 129 F. Supp. 3d 249, 269 (D. Md. 2015) (recognizing Maryland's application of the discovery rule to defamation claims); *Sears, Roebuck & Co. v. Ulman*, 412 A.2d 1240, 1242 (Md. 1980); *Shepard*, 581 A.2d at 844; *see also Saylab*, 332 F. Supp. 2d at 142-43.

> action within the applicable limitations period, measured from the date
> of her acquisition of the actual or imputed knowledge.

*Id.* at 381.  Notably, as the D.C. Court of Appeals has admonished, the determination

of what constitutes "reasonable diligence" or "[w]hat is 'reasonable under the

circumstances' is a highly factual analysis."  *Id.*

Here, "Defendants do not contend that [Mr. Chandler] had actual knowledge

before May 2018 of the [Dossier] or of [Defendants'] role in its preparation."

(DE 32-2 at 11; A491.)[13]  Summary judgment on this issue therefore turns on

whether Mr. Chandler, through the exercise of reasonable diligence, would have

known those facts more than a year before filing this lawsuit.

As explained below, the district court, in granting Defendants summary

judgment on Mr. Chandler's defamation claim arising from their secret 2003

publication of the Dossier to Eringer, reversibly erred in two ways.

***First***, the district court erred in holding as a matter of law that, under this

Court's decision in *Fitzgerald v. Seamans*, 553 F.2d 220 (D.C. Cir. 1977),

Mr. Chandler's knowledge that he could have potentially sued Eringer for

defamation based on statements Eringer made in his 2009 lawsuit, 2014 book, or

2016 blog post—in other words, Mr. Chandler's knowledge that he could have

---

[13] Nor could Defendants so contend, because there is record evidence that Mr. Chandler did not have actual knowledge of the Dossier's existence until May 2018 (or, at the earliest, November 2017) and did not have actual knowledge that Defendants authored that Dossier until May 2018.  (A284-85, ¶¶10-14.)

brought *different* claims against a *different* person based on *different* publications at *different* times to *different* audiences causing him *different* harm—caused his claims against Defendants to accrue.

*Second*, the district court erred in holding as a matter of law that Mr. Chandler, through the exercise of due diligence, could and would have discovered his claim against Defendants based on their secret publication of the Dossier to Eringer in 2003 more than a year before he filed this case such that, even under the discovery rule, his claim is time-barred.

### A. The District Court Reversibly Erred in Holding That Mr. Chandler's Knowledge of Defamation Claims Against Eringer Caused His Claim Against Defendants to Accrue.

Under District of Columbia law, "the plaintiff's knowledge of wrongdoing on the part of one [person] d[oes] not cause accrual of his action against another, unknown [person]." *Diamond*, 680 A.2d at 380 (citing and approving *Fitzgerald*, 553 F.2d at 229); *accord Hobson v. Wilson*, 737 F.2d 1, 36 (D.C. Cir. 1984). As this Court recognized in *Fitzgerald*, however, an exception arises where two people are "responsible for the same harm" and are "closely connected, such as in a superior-subordinate relationship." *Diamond*, 680 A.2d at 380; *see also Fitzgerald*, 553 F.2d at 229; *Hobson*, 737 F.2d at 36.

The district court found that exception applicable here. In doing so, it erred in two separate and independent ways.

1. ***Fitzgerald*** **Is Inapplicable Here Because—as Even the District Court Recognized—Mr. Chandler's Potential Claims Against Eringer and Defendants Arose from Different Harms.**

As an initial matter, the district court erred in applying *Fitzgerald* here. As the *Fitzgerald* opinion makes clear—and as the D.C. Court of Appeals has authoritatively held—the *Fitzgerald* exception to the general rule that "the plaintiff's knowledge of wrongdoing on the part of one [person] d[oes] not cause accrual of his action against another, unknown [person]" only applies where both persons are "responsible for ***the same harm***." *Diamond*, 680 A.2d at 380; *see also Fitzgerald*, 553 F.2d at 229; *Hobson*, 737 F.2d at 36.

Here, however, as the district court recognized, "Eringer's republications of the [Dossier] constitute ***different harms*** than the initial publication of the [Dossier] itself in 2003." (A485.) And the district court's recognition was entirely correct: Under settled District of Columbia law, "each communication of [even] the same defamatory matter" whether "by the same defamer" or a separate person, and "whether to a new person or to the same person, is a separate and distinct publication" that causes separate harm and supports "a separate cause of action." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 n.3 (1984) (quoting Restatement (Second) of Torts § 577A cmt. a); *see also Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1087 (D.C. Cir. 2007) (applying Section 577A); *Foretich v. Glamour*, 753 F. Supp. 955, 960 (D.D.C. 1990) (same).

Nevertheless, the district court held, based on its application of *Fitzgerald* (which was itself erroneous, as explained below), that because of Mr. Chandler's knowledge of his claims against Eringer, "no further factual development is necessary to conclude that reasonable diligence would have enabled [him] to discover Defendants' role." (A489.) That was error; the *Fitzgerald* exception is inapplicable here.

> **2.    Even if *Fitzgerald* Were Applicable, Eringer and Defendants Are Not "Closely Connected" Such That Mr. Chandler's Knowledge of Claims Against Eringer Could Accrue His Claims Against Defendants.**

Even if *Fitzgerald* were applicable here, its holding that where two putative defendants are "closely connected, such as in a superior-subordinate relationship," a plaintiff's knowledge of claims against one operates to accrue his claims against the other would not apply because Eringer and Defendants are not "closely connected." Because a comparison of the facts here to those in *Fitzgerald* makes that conclusion clear, it is necessary to discuss *Fitzgerald* in some detail.

In *Fitzgerald*, a civilian Air Force employee sued Air Force officials and a White House official for unlawfully conspiring to fire him in retaliation for his congressional testimony. 553 F.2d at 223-25. The plaintiff sued in 1974, after the applicable statute of limitations had expired, but argued that the statute was tolled because Air Force officials fraudulently concealed the conspiracy. *Id.* at 228. The district court disagreed and granted summary judgment to all defendants. *Id.* at 228-

43

29.  This Court affirmed in part and reversed in part, holding plaintiff's claims time-barred as to the Air Force defendants but not as to the White House defendant, distinguishing among those defendants based on their relationship (or lack thereof) to each other.

With regard to the Air Force officials, this Court explained that plaintiff's letter to the Civil Service Commission appealing his termination by the Air Force demonstrated that "by 1970, he had facts in hand sufficient to put him on notice of the conspiracy by the Air Force [defendants] to retaliate against him for his congressional testimony."  *Id.* at 228.  By that time, he "not only had a strong suspicion of the 'real' reason for his termination, he knew that immediately after his testimony he was ostracized within the Air Force, his duties were shifted, and he was given no new responsibilities."  *Id.*  He also knew of a memorandum by Air Force officials advocating for his removal, an Air Force investigation of him, and false charges about him that Air Force officials made to Congress.  *Id.* at 228-29.  This Court held that those facts were "sufficient to put [the plaintiff] on notice of the conduct by *some* Air Force officials which is now asserted as the basis for the lawsuit."  *Id.* at 229.

The plaintiff argued that he only later learned the identities of *some* of the Air Force conspirators, but this Court held that irrelevant:

> [Plaintiff] had failed to bring timely action against the higher Air
> Force ... officials, although he knew of their actions and statements and

44

had at least constructive knowledge of grounds for the late lodged suit; *it would be anomalous and unjust to allow [plaintiff] to begin an action against lesser fry merely because their identity and participation were earlier unknown.*

*Id.*[14]    As the D.C. Court of Appeals explained in authoritatively interpreting *Fitzgerald* as a matter of D.C. law, the *Fitzgerald* plaintiff's knowledge of his claim against high-ranking Air Force officials accrued his claim against lower ranking Air Force officials involved in the conspiracy because those officials were all "closely connected"—there in a superior-subordinate relationship.  *Diamond*, 680 A.2d at 380.

    With regard to the White House official involved in the conspiracy, however, this Court reversed the award of summary judgment.  *Fitzgerald*, 553 F.2d at 229.  This Court explained that because *"[the White House defendant] is not lesser fry in the Air Force, but a person of influence in a different center of power"* and nothing in the documents that gave plaintiff notice of the Air Force conspiracy gave him notice of the White House defendant's involvement in it, plaintiff's knowledge of the Air Force conspiracy could not accrue his claim against the White House defendant.  *Id.*  The White House defendant—a member of a separate organization

---

[14] This Court observed that plaintiff's proper course would have been to sue the superior officials he knew were involved in the conspiracy and to then later add the "lesser fry" officials: "The matter would stand differently if appellant had proceeded with diligence within the [limitations] period by suing those conspirators known to him at the time, and later sought to add other participants whose identity he learned in the course of that suit."  *Id.* at 229.

with no connection to the Air Force defendants other than involvement the tortious act—was simply not so "closely connected" that fairness dictated that knowledge of a claim against one compelled the accrual of the claim against the other for the same harm.  *See id.*  Rather, the general rule that "the plaintiff's knowledge of wrongdoing on the part of one [person] d[oes] not cause accrual of his action against another, unknown [person]" applied.  *See Diamond*, 680 A.2d at 380.

Here, the district court analogized Eringer and Defendants to the Air Force superior and "lesser fry" officials in *Fitzgerald* rather than to an Air Force official defendant on the one hand and a White House official defendant on the other. (A489.)  In so doing, the district court found dispositive the fact that Defendants produced the defamatory Dossier for Eringer.  (*Id.*)  According to the district court, by virtue of their agreement to produce or procure the defamatory Dossier, "Eringer and Defendants were working in lockstep" and, "[f]or that reason, they are 'closely connected.'"  (*Id.*)

The district court's analysis, however, was incorrect.  Indeed, the very fact that the court found dispositive—that Eringer and Defendants were connected by tortious conduct (their actions with regard to the defamatory Dossier)—held true for the Air Force and White House defendants in *Fitzgerald* who were joined in the conspiracy to harm the plaintiff but who this Court held were ***not*** so "closely

46

connected" that knowledge of a claim against one accrued a claim against the other. *See Fitzgerald*, 553 F.2d at 229.

Moreover, record evidence demonstrates that Eringer and Defendants were ***not*** "closely connected" like the Air Force officials in *Fitzgerald*. Not only were Eringer and Defendants not in a superior-subordinate relationship, but they do not (and did not) share any ongoing relationship at all. They are not officers or officials in the same organization, group, or company. They are not members of the same organization, group, or company. They are not even members of the same industry or profession: Eringer is a freelance journalist and Defendants are an investigative firm and its principal. In *Fitzgerald*'s terms, Eringer and Defendants are people in "different center[s] of power." In fact, the *only* "connection" between Eringer and Defendants is that they contracted at arms'-length in connection with production and procurement of the defamatory Dossier. Such "connection" was also shared by the Air Force and White House defendants in *Fitzgerald*, but that was not enough for them to be deemed "closely connected" for claim-accrual purposes.

Moreover, unlike the plaintiff in *Fitzgerald*, Mr. Chandler did not have reason to believe that *any* conspiracy was afoot such that it might be reasonable to expect him to search out additional members of a known conspiracy. Under such circumstances this Court has held the "case for tolling is even stronger," because the plaintiff "ha[s] no reason ... to suspect anybody other than the [one known potential

defendant] of any tortious conduct." *Richards v. Mileski*, 662 F.2d 65, 70 (D.C. Cir. 1981). In sum, the district court erred in its interpretation of *Fitzgerald*, and the cases it cited as supporting its interpretation do not do so.[15]

**B.    The District Court Reversibly Erred in Holding That Mr. Chandler, Through the Exercise of Reasonable Diligence, Could and Would Have Discovered His Claim Against Defendants More Than a Year Before He Filed This Case.**

Finally, the district court erred in granting summary judgment to Defendants on Mr. Chandler's defamation claim based on their secret 2003 publication of the Dossier to Eringer on the ground that (1) he was on inquiry notice of Defendants' authorship and secret publication of the Dossier and (2) would have discovered Defendants' authorship and secret publication of the Dossier had he exercised reasonable diligence to investigate Defendants.

---

[15] *See Nader v. Dem. Nat'l Comm.*, 567 F.3d 692, 702 (D.C. Cir. 2009) (claim based on "the known relationships among the co-conspirators"; second defendant's "role was hardly a secret"); *Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129, 162-63 (D.D.C. 2018) (products liability case; plaintiff investigated only one component of defective multi-component system despite obvious awareness of all components); *Gardel v. SK & A Structural Eng'rs PLLC*, 286 F. Supp. 3d 120, 125-28 (D.D.C. 2017) (plaintiff sued only property owner when unsecured bollard fell on him; falling bollard put plaintiff on notice of defective installation or maintenance and building permit "plainly identifies SK&A as engineering consultant for" bollard installation); *Sandza v. Barclays Bank, PLC*, 151 F. Supp. 3d 94, 115-16 (D.D.C. 2015) ("plaintiff was aware of the close working relationship between [bank] and [law firm]" but sued only law firm for tort in which bank also participated).

According to the district court, Mr. Chandler "was put on inquiry notice of Defendants' role [in authoring and publishing the Dossier] when he learned of" Eringer's 2009 lawsuit against Prince Albert II, 2014 book *The Spymaster of Monte Carlo*, and 2016 blog post excerpting that book.  (A492-93.)  And, according to the district court, in light of that inquiry notice, reasonable diligence required Mr. Chandler to sue Eringer for defamation based on those publications to obtain court-ordered discovery through which he "surely would have discovered the [Dossier] and that [Defendants] w[ere] its author."  (A489-90, A493.)  But those holdings are erroneous.

*First*, the district court erred in holding that Eringer's 2009 lawsuit, 2014 book, and 2016 blog post put Mr. Chandler on inquiry notice that the Dossier existed and that Defendants authored and published it.  (A492-93.)

According to the district court, Eringer's 2009 lawsuit against Prince Albert II put Mr. Chandler on inquiry notice of the Dossier's existence and Defendants' authorship and publication thereof because—and only because—Eringer stated in his complaint in that lawsuit that "Eringer intensively investigated ... a commodity trading company headquartered in Monaco ... and its principals Richard and Christopher Chandler ... who[] it was suspected were engaged in money laundering for Russian interests," and "Eringer possesses documents on this matter."  (A492 (quoting A310, ¶13).)  But the very paragraph of Eringer's complaint quoted by the

district court made clear that Eringer himself took full credit for investigating Mr. Chandler, averring that "***Eringer investigated***" him. (*Id.*) The complaint, which spans over 150 paragraphs and over 30 pages, makes no reference whatsoever to Defendants, no reference whatsoever to the Dossier, and no reference whatsoever to Eringer working with anyone to produce any dossier on Mr. Chandler. The fact that Eringer stated that he "possesses documents on th[e] matter" of "Eringer['s] intensive[] investigat[ion]" of Mr. Chandler does not in itself suggest Defendants' involvement. Indeed, Eringer repeated the same "Eringer possesses documents on this matter" line no fewer than 28 times in his complaint, in connection with allegations about Eringer's own actions and persons (like Mr. Chandler) who "Eringer investigated." (A309-32.) As such, Eringer's 2009 lawsuit could not have put Mr. Chandler on inquiry notice that Defendants authored and published the Dossier to Eringer, much less do so as a matter of law.

According to the district court, Eringer's 2014 book *The Spymaster of Monte Carlo* and his 2016 blog post excerpting that book put Mr. Chandler on inquiry notice of the Dossier's existence and Defendants' authorship and publication thereof because—and only because—Eringer "uses 'we' and 'our' when referring to his investigation of the Chandler brothers." (A493.) According to the court, those are "obvious clues" that Eringer did not act alone in his investigation of Mr. Chandler. The court, however, ignored the fact that such first-person-plural-pronoun usage,

which is often referred to as the "royal we," "nosism," or the "author's we" is not uncommon among writers. *See, e.g.*, *Rawlins v. Kansas*, 714 F.3d 1189, 1194 (10th Cir. 2013) ("'us' is the object equivalent of the 'royal we'"); *Bailey v. Astrue*, No. 09-cv-174, 2009 WL 3334893, at *2 (W.D. Ky. Oct. 15, 2009) ("[C]laimant's objection to the use of the pronoun 'we' in the [ALJ's] decision is hardly worthy of any attention; judicial decision makers have used the nosism in opinions for more than two centuries."), *aff'd sub nom. Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853 (6th Cir. 2011). Indeed, as explained in the leading usage guide *Chicago Manual of Style*, "some writers [] use *we* to make their prose appear less personal and to draw in the reader or listener." *Chicago Manual of Style* ¶5.51 (15th ed. 2003). And, like Eringer's 2009 lawsuit, his 2014 book and 2016 blog post make no reference whatsoever to Defendants, no reference whatsoever to the Dossier, and no reference whatsoever to Eringer working with anyone to produce any dossier on Mr. Chandler. Eringer's usage of the "royal we"—the only fact about Eringer's 2014 book and 2016 blog post that the district court suggested put Mr. Chandler on inquiry notice that Defendants authorized and published the Dossier to Eringer—does not put him on notice, much less as a matter of law.

**Second**, the district court erred in holding that reasonable diligence required Mr. Chandler to sue Eringer for defamation based on his statements in his 2009 lawsuit, 2014 book, and/or 2016 blog post in order to obtain court-ordered discovery

51

through which he "surely would have discovered the [Dossier] and that [Defendants] w[ere] its author." (A489-90, A493.) Contrary to the district court's holding—for which it provided no citation—"[i]t is settled that reasonable diligence does ***not*** require a person to commence a lawsuit in order to procure court-ordered discovery of concealed facts." *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986); *accord Locke v. Allstate Ins. Co.*, 145 F.3d 1346, 1998 WL 193135, at *2 (10th Cir. 1998) (unpublished) (reversing summary judgment for defendant where the district court "was of the view that due diligence required [plaintiff] to initiate a lawsuit to ... uncover concealed facts"); *see also Foltz v. U.S. News & World Report, Inc.*, 627 F. Supp. 1143, 1150 (D.D.C. 1986) ("[A] prospective plaintiff does not have to file suit on a hunch[.]"). That law makes sense: an unknown claim only accrues if a plaintiff would learn of that claim through "***reasonable*** diligence," and "reasonable diligence" does not mean "maximum feasible diligence" or even an "unusual level of diligence." *United States v. Rice*, 727 F. App'x 697, 701 (D.C. Cir. 2018) (so holding in the much stricter context of a habeas petition). Surely, requiring a prospective plaintiff to hire legal counsel, pursue litigation, overcome dispositive motions practice, and serve and compel discovery in order to potentially discover a claim against a hitherto unknown defendant does not square with requiring *reasonable*, not maximum, diligence.

Moreover, even if Mr. Chandler had sued Eringer over statements in his lawsuit, book, and/or blog post, there would be no guarantee that he would have obtained discovery from Eringer that would have identified Defendants, and the district court's supposition otherwise is pure speculation. Even to obtain discovery, Mr. Chandler would have had to overcome Eringer's motions to dismiss, and as the U.S. Supreme Court has long recognized, litigation is inherently uncertain and "[i]t is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case." *Whitmore v. Arkansas*, 495 U.S. 149, 159-60 (1990). Eringer may well have had meritorious defenses to those lawsuits. For example, defamation claims based on Eringer's statements in his 2009 lawsuit would almost certainly fail on a motion to dismiss because most jurisdictions recognize "an absolute privilege for statements made ... in the course of[] a judicial proceeding, so long as the statements bear some relation to the proceeding." *E.g.*, *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C. 2001) (D.C. law). Plus, even if Mr. Chandler overcame motion to dismiss, there is no guarantee that Eringer would have possessed documents revealing the existence of the Dossier and Defendants' authorship thereof.

Moreover, record evidence strongly suggests that no evidence—at least no evidence obtainable through reasonable diligence—exists connecting Defendants to Eringer. Defendants have represented that they long ago destroyed all documents

related to the Dossier and their contract with Eringer to produce it.  (A274, ¶63; A403, ¶2.)  And Defendants stated in sworn interrogatory responses that they are *"unaware of __any source__"* that "was publicly available before September 14, 2017 that identified [Defendants] as the author of the [Dossier]" and that they are likewise *"unaware of __any source__"* that "was publicly available before September 14, 2017 that identified [Defendants] ... as having performed work regarding Chandler for Robert Eringer."  (A467-68.)

Likewise, despite being able to employ judicial means of discovery, Mr. Chandler has been unable to obtain any documents from Eringer suggesting the existence of the Dossier or Defendants' authorship thereof.  Mr. Chandler's counsel has repeatedly attempted to locate Eringer to serve a document subpoena on him, but Eringer has successfully hidden his whereabouts and evaded service.  (A478-80, ¶¶4-11 (detailing counsel's efforts and the facts that Eringer listed a UPS store as his place of residence on his California driver's license, Eringer's counsel refused to accept service on Eringer's behalf, and several private investigators (including a former CIA agent) have spent over 50 hours searching both databases and cities where Eringer has been known to reside without success in locating him).)

In sum, Mr. Chandler could not through the exercise of reasonable diligence have learned of the Dossier and Defendants' authorship thereof more than a year

before filing this lawsuit, and the district court erred in holding otherwise as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Plaintiff-Appellant Chandler respectfully requests that the Court reverse the district court's judgment granting summary judgment to Defendants and remand this case to the district court with instructions that the parties proceed to full discovery.

Date:  June 15, 2020                    Respectfully Submitted,

  /s/ Joseph. R. Oliveri
THOMAS A. CLARE, P.C.
JOSEPH R. OLIVERI
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
joe@clarelocke.com

*Attorneys for Plaintiff-Appellant
Christopher Chandler*

## CERTIFICATE OF COMPLIANCE

### 1.    Type Volume

[X]    This document complies with type-volume limits of FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f) (cover page, corporate disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, proof of service, attachments), this document contains 12,768 words.

### 2.    Typeface and Type-Style

[X]    This document complies with the typeface requirements of FRAP 32(a)(5)(A) and the type-style requirements of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


  */s/ Joseph. R. Oliveri*
Joseph. R. Oliveri
*Attorney for Plaintiff-Appellant Christopher Chandler*

Dated:  June 15, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this Principal Brief of Plaintiff-Appellant was filed with the Clerk of the Court using the Court's CM/ECF system on June 15, 2020, which will send notification of such filing to counsel for all parties as follows:

Steven Michael Oster
John Patrick Dean
OSTER MCBRIDE PLLC
1320 19th Street, NW
Suite 601
Washington, DC 20036
Telephone: (202) 596-5291
Telephone: (202) 725-8110
Email:  soster@ostermcbride.com
Email:  johndean8@aol.com

Dated:  June 15, 2020                    By:    */s/ Joseph. R. Oliveri*
                                                Joseph R. Oliveri

57